## THE NOEL CONSTRUCTION COMPANY OF BALTIMORE CITY *vs.* THE ATLAS PORTLAND CEMENT COMPANY.

*Formation of Contract by Letter Enclosing Formal Agreement Unsigned—Right of Principal to Sue on Contract Made in Agent's Name—Contract Under Seal—Measure of Damages for Breach of Contract to Sell Goods.*

An agreement for the sale of goods by A to B provided that a written contract should be executed by them. Afterwards A wrote to B enclosing a formal written contract containing the terms agreed upon with a request that it be executed and returned and saying that upon receipt the writer would forward a properly executed contract. B signed the contract and returned it to A, by whom it was retained, but A subsequently refused to execute and send to B the duplicate as promised and repudiated the agreement. *Held,* that A was as effectually bound by his letter forwarding the contract for B's signature, who executed it, as if he had signed and delivered a duplicate copy.

Two persons to whom a contract for the erection of a building was awarded formed a corporation for the purpose of doing the work. The defendant agreed to sell a quantity of cement to the individual contractors, but was fully informed at the time that they were acting as agents for the corporation. *Held,* that the corporation is entitled to sue on the contract so made for its benefit upon the ground that a principal is authorized to maintain an action on a contract made for him by his agent in the agent's own name.

When a written contract concludes with the words: "Witness our hands and seals," but is signed and not sealed, it is valid as a simple contract.

When parties stipulate that their agreement shall be put in the shape of a written contract, one of them is not entitled to require that the written contract shall be executed under seal.

If a seller fails to deliver the goods sold and the buyer is compelled to purchase goods of the same quality in the open market at a higher price, the seller is liable for the difference between the contract price and that so paid by the buyer.

Appeal from the Superior Court of Baltimore City (WRIGHT, J.)

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*Joseph C. France* and *J. Kemp Bartlett*, for the appellant.

*First.* The appellee entered into a binding contract to deliver the cement. (*a*) It may well be contended the contract was formed on January 31st, 1902, by the offer and acceptance of that date. The apparent qualification contained in the acceptance evidently contemplated nothing more than a subsequent formal expression of an agreement already reached. This is clear from the light reflected by the surrounding circumstances, upon the situation and language of the parties. The appellee was anxious for the cement contract and "our Mr. McClaren" had come to Baltimore for the purpose of closing the deal. He wrote the offer and dictated the acceptance. The offer and acceptance contain all the terms of a completed contract: subject-matter, quantity, quality, government test and approval, price, time and place of delivery. It is not pretended that a single term was unsettled or left for future discussion; and it is evident that the language "subject to a contract which may be mutually agreed upon later" must be construed untechnically, and that it was intended as a compliance with the resolution of the appellant's directors adopted on January 27th—a few days before the interview at Hotel Rennert. The test is: What did the parties intend by the offer and acceptance and by the qualifying language used? The Court must look to the surrounding conditions for the answer. *First Nat. Bank* v. *Gerke*, 68 Md. 456. When Mr. McClaren left, did he believe and intend that the cement deal was closed, or that Noel could back out any time before the formal contract was signed? The best answer is to be found in the appellee's letter of February 6th, 1902; and it seems clear that no subsequent formal contract could, without mutual consent, change the binding agreement reached on January 31st, 1902. Note to *Sanders* v. *Potlitzer Co.*, 29 L. R. A. 431; *Cheney* v. *Eastern Trans. Co.*, 59 Md. 557.

(*b*) But, in any event, a binding contract was formed by the

acceptance of the formal agreement as drawn by the appellee, and identified by and enclosed in the letter of March 7th, 1902, signed by the vice-president. This paper was produced by the appellee, at the trial below, on the plaintiff's call. It varies the original proposal and acceptance in the matter of deliveries; but it was accepted because McClaren said "it was that or nothing." In the letter, returning the signed agreement, Noel says that it does not "clearly" show that the cement must pass government inspection; in fact, however, that paper is clear enough on this point, as was the original proposal. But Noel's statement of what he thought the signed agreement meant could not vary any obligation under it (1 *Page on Contracts*, 78, and cases cited), and the same is true of the subsequent letters disingenuously written by the treasurer of the appellee.

*Second.* The appellant is entitled to sue on the contract. (*a*) There was certainly enough information given to the appellee to charge it with notice of the fact that Noel and Thomas, in purchasing the cement, were acting as agents of the Construction Company. But the question to be determined is not whether the Cement Company knew the position of Noel and Thomas towards the Construction Company; but what that position was. The existence or non-existence of agency is determined by the law; and not by the names the parties use, nor necessarily by their intention. 2 *Page on Contracts*, sec. 960. And the right of a principal to sue on an agent's contract does not depend on the defendant's knowledge or ignorance of the agency. *Oelrichs* v. *Ford*, 21 Md. 489; *Balto. Coal Tar Co.* v. *Fletcher*, 61 Md. 288. And the agent may, if he chooses "superadd his own responsibility" to that of his principal. *Key* v. *Farnham*, 6 H. & J. 349; *McClernan* v. *Hall*, 33 Md. 296. Applying these principles to the facts disclosed by the record, how could the Court below have concluded that there was no evidence legally sufficient to show the relation of agency between Noel and Thomas and the Noel Construction Company? They had, for valuable consideration, transferred all their rights under

the government contract to the corporation: the corporation had raised a large sum of money, had procured the surety, and had agreed to do the work and pay the bills. What was this relationship, *inter sese*, but agency? What Court would have permitted Noel and Thomas (president, directors and members of the purchasing committee) to withhold from the corporation the benefit of the contract made with the appellee?

(*b*) It was suggested below that Noel and Thomas, being only two (although a majority) members of the committee appointed by the resolution of January 27th, had no authority to represent the Construction Company in the deal with Mc-Claren on January 31st. But this contention is not based on the true view of the facts: besides it ignores, the transaction between McClaren and Bartlett, the third member of the committee, and it ignores the principle of ratification and adoption. *Tiedeman* v. *Ledermann*, 1899, 2 Q. B. 66; 2 *Page on Contracts*, sec. 972 and cases cited.

(*c*) At the very first interview between McClaren and Noel, the former was told that a Construction Company was in contemplation: when the interview of January 31st took place, the company had already been formed, and had taken over the government contract for all purposes and to every extent consistent with the nominal relation of Noel and Thomas to the government—a relation in which the government alone was interested. The consideration for the cement contract moved from the Construction Company; it was the beneficiary under the contract, and, irrespective of the question of agency could sue thereon. *Small* v. *Schaefer*, 24 Md. 143, and see cases cited in briefs of counsel, *Simon's Sons Co.* v. *Md. Tel. Co.*, 99 Md. 144, 157.

*Finally.* The rise in the market for cement was such that the appellee, after paying the appellant's claim, will still be left with a profit of over twelve thousand dallars, as a result of breaking its contract. But suppose the market had fallen and the Construction Company had refused to accept deliveries; or suppose the cement had been delivered and the Construction Company had refused to pay on the ground that the sale

was made to Noel and Thomas and not to it. Could it be seriously claimed that the record here contains no evidence legally sufficient to show that in making the purchase, Noel and Thomas had acted as agents of the Construction Company?

*Wm. Reynolds* and *Albert C. Ritchie* (with whom was *Stuart S. Janney* on the brief), for the appellee.

1. The undisputed evidence in this case shows that no contract was entered into by the appellee for the furnishing of the cement in question. On January 31st, 1902, the appellee offered to supply Noel and Thomas with twenty-five thousand (25,000) barrels of cement, or with what amount they might require, at one dollar and twenty cents ($1.20) per barrel, four bags to the barrel, subject to the engineer's approval on test, and the usual rule for bags to be exacted. On the same day Noel and Thomas accepted this offer, but inserted in their letter of acceptance the following: "Terms 90 per cent in thirty days or 1 per cent cash in ten days. The cement to be delivered as we may require it on order. This acceptance is subject to a contract which may be mutually agreed upon later."

It thus appears that the offer said nothing about the *terms of payment* and nothing about the *times of delivery*, although the acceptance covered both of these matters. The acceptance thus contained terms not included in the offer. For this reason alone, the letters of January 31st, 1902, do not constitute an agreement between the parties. *Somerville* v. *Copage*, 101 Md. 519; *Joseph Bros. Co.* v. *Schonthal Co.*, 99 Md. 382; *Wheeling Steel Co.* v. *Evans*, 97 Md. 305; *Johnson v. Corbett*, 95 Md. 746; *Hand* v. *Evans Marble Co.*, 88 Md. 226.

In *Decker* v. *Gwinn*, 95 Ga. 518, it is expressly decided that a contract is not complete if the *time of delivery* is left open. In *Shepard* v. *Carpenter*, 54 Minn. 153, it is expressly decided that a contract is not complete if the *time of payment* is left open. Upon this last point, see also *Joseph Bros. Co.* v. *Schonthal Co.*, 99 Md. 382, 394. See further, *Page on Contracts*, vol. 1, sec. 45.

Moreover, the letter from Noel and Thomas expressly

stated that: "This acceptance is subject to a contract which may be mutually agreed upon later." This shows conclusively that an agreement between the parties was never intended to be consummated by the exchange of letters of January 31st, 1902. It was the clear intention that the agreement should be reduced to writing and signed by the parties, before any contractual obligation should exist. It was necessary that such matters as an analysis of the cement furnished, the tensile strength of the cement, etc., as well as the terms of payment and the times of delivery, should be provided for. Therefore, the letters of January 31st, 1902, were tentative merely, and were intended as no more than a working basis for the contract itself, which contract "was to be mutually agreed upon later."

That this is the true effect of these letters is shown by the subsequent correspondence. On February 6th, 1902, the appellee writes for information to assist in *preparing the contract.* On February 11th, 1902, Noel and Thomas give this information, and say they *will forward contracts in a few days.* On February 18th, 1902, Noel and Thomas, through their Annapolis office, asked for a shipment of cement, and on February 19th, 1902, the appellee replies that it cannot forward cargo because *the agreement has not yet been received.* On February 20th, 1902; Noel and Thomas write that their counsel had been out of town, but that the contract *will be forwarded immediately.* On February 26th, 1902, Noel and Thomas send the appellee contracts in duplicate. On March 6th, 1902, the appellee replies that the form of contract sent by Noel and Thomas is "not at all satisfactory," and that it will draft one itself. For this purpose, the appellee requests a copy of the specifications. On March 6th, 1902, Noel and Thomas forwarded the specifications, and asked to know the appellee's objections, as "we may be liable to come to an agreement in regard to the matter."

Down to this point there was certainly no contract. The acceptance of January 31st, 1902, was expressly made *subject to a contract thereafter to be agreed upon,* and the subsequent

correspondence shows that the appellee consistently refused to furnish any cement until the contract had been prepared and executed, and that Noel and Thomas recognized the correctness of this position. This, shows that it was intended to reduce the agreement to writing, and that until this was done, and the agreement signed, there would no contract between the parties.

It is well settled that even where all the terms of a contract have been agreed upon, still if the parties intend that the contract itself shall be reduced to writing, and signed, before any obligation shall be incurred, then there is no contract until this is done, and until it is done either party may withdraw from the contemplated agreement. All the more must this be so where, as here, all the terms were not agreed upon, in that the times of payment and the times of delivery were left open. The principle is stated in *Green v. Cole*, 103 Mo. 70, as follows: "Though the terms of the contract may all be agreed upon, still if the parties make it a condition to the existence of a contract that the terms agreed upon shall be reduced to writing, and signed by them, there is no contract until this is done. 1 *Addison on Contracts*, Morgan's ed., p. 37." "On the other hand, it is well-settled law that, where parties have assented to all the terms of the contract, the mere reference to a future contract in writing does not negative the existence of a present contract."

In *Commercial Telegram Co. v. Smith*, 47 Hun. 494, the party accepting an offer stated that it was "ready to execute an agreement upon the basis proposed whenever prepared and submitted to us." The Court held that until the agreement was reduced to writing and signed, no contract existed. In *Callanan v. Chopin*, 158 Mass. 113, an acceptance "subject to a proper written contract to be prepared" was held to create no contract. In *Congdon v. Darcy*, 46 Vt. 478, the Court, in speaking of a contract agreed upon, but intended to be binding only when reduced to writing, said that until the written agreement was prepared and signed "either party had the right to refuse to enter upon the performance of the con-

tract." See also the following: *Water Commissioners* v. *Brown*, 32 N. J. Law, 504, 510; *Wharton* v. *Stoutenburgh*, 35 N. J. Eq. 266; *Fredericks* v. *Fusnacht*, 30 La. Ann. 117; *Paige* v. *Fullerton Wollen Co.*, 27 Vt. 485; *Honeyman* v. *Marrizatt*, 6 H. L. Cas. 112; *Chinnock* v. *Marchioness*, 4 De G. J. &. S. 645–6; *Green* v. *Pennsylvania Steel Co.*, 75 Md. 109; *Page on Contracts*, vol. 1, sec. 54; *Eads* v. *Carondelet*, 42 Mo. 113.

The same principle has been decided by our Court of Appeals in *Wills* v. *Carpenter*, 75 Md. 80, where this Court cites with approval the following statement of LORD WESTBURY: "But if to a proposal or offer an assent be given subject to a provision as to a contract, then the stipulation as to the contract is a term of the assent, and there is no agreement independent of that stipulation." ·

It therefore appears that not only did the letters of January 31st, 1902, constitute no contract, because the minds of the parties never met upon the terms of payment and the times of delivery, but that the parties intended that neither should be bound until a formal agreement embodying all the terms had been first reduced to writing and then signed by both parties. As already shown, Noel and Thomas'· draft of this agreement was rejected by the appellee, and therefore up to this time clearly no contract had been made.

On March 7th, 1902, the appellees sent Noel and Thomas a draft of contract prepared by it, saying: "If same is satisfactory, please execute and return, and upon receipt we will forward you our copy properly executed." On March 26th, 1902, Noel and Thomas returned this draft, signed by Noel for himself and for Thomas, but not sealed, and on April 2nd, 1902, the appellee notified Noel and Thomas that it would not enter into the contract.

We submit that the sending of this draft by the appellee, with the request that Noel and Thomas execute it *if satisfactory*, and with the statement that upon receipt of the same executed, the appellee *would forward its copy properly executed*, does not constitute an intention by the appellee to be bound on said paper.

It is clear that to hold the appellee liable, some act must be shown which clearly indicates that the appellee *intended* to be bound by the writing in question. Moreover, signing alone would not be sufficient, but it must be duly executed, *i. e.*, in this case also sealed, as it concluded with the words "witness our hands and seals," the absence of scrolls being explained by the fact that scrolls are not used for seals in New York, where this paper was prepared, and there must also be a delivery, "accompanied by the intention of both parties that the instrument shall take effect thereby. *Mere change of custody without this intention does not constitute a delivery.*" *Page, Contracts*, vol. 2, secs. 579 and 686; *Harrison* v. *Morton*, 83 Md. 456.

Of course, delivery is not necessary in the case of a memorandum required to be signed under the Statute of Frauds. *Drury* v. *Young*, 58 Md. 546.

Nor is it necessary, in order to comply with the statute, that the written agreement itself be signed, it being sufficient in such case if the written agreement is referred to and acknowledged in a letter which is signed by the party to be charged. *Parsons, Contracts*, vol. 3, bottom paging, 4, note c.

This however is not a case under the Statute of Frauds. It is not sufficient to produce a written memorandum signed by the appellee. This is a case where it was intended that there should be no agreement, until a formal written contract was prepared and executed by both parties. In such case the above citations show that no liability will be incurred, unless there exists the *intention to be bound*, accompanied by the *delivery* of the instrument as the *final obligation* of the parties. In *Parsons on Contracts*, vol. 3, bottom paging 8, the law is stated as follows: "If one wrote, 'In consideration of, etc., I, A. B., promise to C. D., etc.,' and kept the paper in his own hands without signature, it might be supposed that he delayed signing it because he was not ready to make his promise and bind himself. *So if he gave it to the other party to examine and see if it was acceptable to him, or for any similar purpose, it would not be held to be signed by him.*"

In the present case the appellee did not sign the draft it sent Noel and Thomas, nor did it deliver that draft to them with the intention that by so doing it was thereby to become a binding contract.  The appellee merely sent the draft for the purpose of seeing whether it was satisfactory to Noel and Thomas, and if so, of having it signed by them, but the proposed agreement could not become binding until returned to the appellee and *properly executed by the appellee.*  Until this was done, there would be no meeting of the minds.  Therefore, since the appellee never did execute the paper, but on the contrary refused to execute it, it follows that no contract between the parties was made.

There is another reason why no contract exists in this case. It is well settled that the acceptance of a contract *"must correspond to the offer at every point."*  *Page, Contracts*, vol. 1, sec. 45.  The contract returned as executed by Noel and Thomas, was really signed only by Noel, who signed for himself and for Thomas also.  The attention of Noel and Thomas was called to this by the appellee on April 1st, 1902, and the appellee then requested that Noel and Thomas send it "a paper from Mr. Thomas authorizing the signature," or else that Mr. Thomas sign the agreement himself.  On April 2nd, 1902, Noel wrote that he had a power of attorney from Thomas, but that if the appellee desired the contract signed by Thomas, it would be done.  The power of attorney, however, was never produced, so that the Court cannot pass upon its sufficiency.  Therefore, Noel signed the agreement, but Thomas did not, and Noel's authority to sign for Thomas was not shown.  Inasmuch as it was clearly contemplated that the formal agreement should not become binding unless signed and sealed by both Noel and Thomas, we submit that the signature of Noel alone, without any seal, was not sufficient, and that as the appellee broke off negotiations before the paper was signed by Thomas or sealed by either Noel or Thomas, the agreement sued on has never been executed either by the appellee or by Noel and Thomas.  See *State, use Gilkeson*, v. *Humbird*, 54 Md. 327.

Moreover, the draft of agreement expressly contemplated that it should be executed by the parties under their "*hands and seals.*" In signing the paper Noel did not affix his seal, nor did he affix a seal after Thomas' name. Therefore, the agreement was not accepted in the form in which it was offered. It was offered as a sealed instrument, and accepted as a simple contract.

We have already shown that a contract is not made unless the offer is accepted according to its terms, and in the form in which it is presented. In *Wiswell* v. *Bresnahan*, 84 Me. 397, it was held that where an acceptance is required to be *in writing*, no other form of acceptance can be made. In *Bernard* v. *Torrence*, 5 G. & J. 383, this Court held that where the acceptance was required by *return mail*, no other mode of acceptance would be sufficient.

In *State, use Gilkeson* v. *Humbird*, 54 Md. 327, it was held that a bond signed *but not sealed* by one of the parties to it, was not the deed of such party, even though the seal was *intended* to be affixed, and was omitted through *inadvertence or mistake.*

As the appellee's draft provided for the seals of the parties, it could not become effective unless accepted as presented, that is, under seal. Since Noel did not accept the paper under seal it follows that his signature, without any seal, constituted no acceptance at all. More than this, as the draft expressly provided for seals, it is clear that the only kind of agreement the appellee was willing to take, was an agreement under seal, and under the *Humbird case, ante*, the paper as signed could not be effective as a sealed instrument. Of course, as decided in *Stabler* v. *Cowman*, 7 G. & J. 284, it might still be the simple contract of Noel and Thomas, or at least of Noel, but the form of the agreement shows that the appellee did not want a simple contract, but wanted a sealed instrument. A sealed instrument was never executed, and the appellee was under no obligation to accept anything less.

For the above reasons the appellee never executed the alleged agreement, and Noel and Thomas never accepted and executed it as presented to them. Therefore no contract was ever made for the furnishing of the cement in question.

2. Assuming that a contract exists in this case, it is a contract between the appellee and Noel and Thomas, the latter acting in their individual capacity as associate contractors, and not acting as agents for or on behalf of the Noel Construction Company; and, therefore, the Noel Construction Company is not entitled to maintain any action against the appellee based on said contract.

The choice was given sub-contractors of electing between two distinct kinds of contracts, the one with the Noel Construction Company, the other with Noel and Thomas, associate contractors, and these two kinds of contracts involved different rights and obligations, and were between different parties.

. The correspondence shows that the appellee's alleged agreement had to be with Noel and Thomas in their individual capacity, as associate contractors, and could not be with them as agents for the Noel Construction Company.

The oral testimony shows that the appellee was given the option of contracting either with the Noel Construction Company or with Noel and Thomas, associate contractors; that the appellee elected to contract with Noel and Thomas; and that the alleged agreement was made with Noel and Thomas in their individual capacity as associate contractors, and not with them as agents for the Noel Construction Company.

The alleged agreement shows on its face that Noel and Thomas contracted in their individual capacity as associate contractors, and therefore parol evidence tending to show that they really contracted as agents of the Noel Construction Company is incompetent for that purpose, because it is inconsistent with, and would contradict and vary, the clear terms of a written instrument.

Under these circumstances, we submit that parol testimony tending to show that Noel and Thomas were really agents for the Construction Company, for some purposes, is not competent to contradict and vary the clear terms of the written instrument, by which they contract in their individual capacity.

The meaning of an agreement, and the capacity in which

the parties sign, must always be drawn from the agreement itself, if this be possible, and where the contract is *neither silent nor uncertain*, but is *clear*, as to the capacity in which the parties sign, then there is nothing to explain, no ambiguity to clear up, and parol evidence could only contradict or vary that which is definitely expressed in the contradict itself.

In the present case, as we have already seen, the "Memorandum of Agreement" *shows clearly on its face* that it was a contract between the appellee and Noel and Thomas, in their individual capacity, as associate contractors. Therefore, the agreement is neither *silent,* as to the capacity in which Noel and Thomas signed, nor is it *ambiguous;* but, on the contrary, it is clear. Hence parol testimony is not competent to vary its terms in this respect.

It must also be remembered that the signature of Noel and Thomas as *associate contractors* is not consistent with the appellant's theory that they signed as its *agents.* The facts of this case are peculiar in that the appellee had its choice of contracting with the Noel Construction Company or of contracting with Noel and Thomas, associate contractors. Therefore, when the appellee took the contract with Noel and Thomas, associate contractors, it simply cannot be that it in fact took a contract with the Noel Construction Company. That was the contract which the appellee did *not* take, although the privilege of doing so was conferred. Where the option is given of selecting one of two different parties with whom to contract, and that option is exercised, and one of those two parties selected, it would certainly be an anomaly to construe that contract into an agreement with the party who was *not* selected, but who was *rejected*, on the theory that the rejected party was really the agent for the accepted party.

3. Noel and Thomas had no authority to bind the appellant by the kind of contract alleged to have been made with the appellee in this case, and therefore, there being no ratification, the appellant cannot sue the appellee upon it.

4. Assuming a contract to exist in this case, it must be treated as a contract executed by Noel and Thomas under seal, and therefore they only are entitled to sue upon it.

We have already shown that the agreement as drafted by the appellee purported to be a sealed instrument, and could only be validly accepted under the seals of Noel and Thomas. Therefore, if this agreement is to be taken as executed by Noel and Thomas at all, it must be treated as if executed by them *under seal.* Of course, Noel signed the paper for himself and Thomas without in fact affixing any seal, and for the reasons already given we do not think an acceptance of this kind valid. But if such an acceptance is valid, then the instrument must be treated as if actually executed by Noel and Thomas under seal, because otherwise a simple contract would be forced upon the appellee, whereas the contract it tendered was a contract under seal.

It is well settled that the rule allowing a principal to sue upon a contract made by an agent in his own name applies only to simple contracts, and does not extend to contracts executed by the agent under seal. Whenever a contract under seal is made by an agent in his own name, the agent alone is the party in whose name a recovery upon it can be had. *Mechem, Agency,* sec. 758; 1 *Encyclopædia of Law,* p. 1051, notes 4–6; p. 1165, note 2; p. 1171, note 2; *Baltimore Coal Tar Co.* v. *Fletcher,* 61 Md. 288, 295.

If the signature of Noel for himself and Thomas constituted an acceptance of the agreement sent him (as we earnestly contend cannot be the case), that acceptance must, as already shown, be considered an acceptance under seal, and must have the same effect as if it was actually followed by the seals of Noel and Thomas. In other words, it is in law a sealed instrument. This being so, it follows that even if Noel and Thomas were the agents of the appellant to enter into a contract of this kind, still the contract they actually made was in their own names, and must be treated as if under their own seals, and therefore they alone are entitled to sue upon it.

PEARCE, J., delivered the opinion of the Court.

This action was brought by the Noel Construction Com-

pany, a corporation, to recover from the Atlas Portland Cement Company, a corporation, damages for the breach of an alleged contract to deliver to the plaintiff twenty-five thousand barrels of cement purchased for use in the erection of Midshipmen's Quarters at the Naval Academy in Annapolis, Maryland.

The declaration contains the common money counts, and the following special count: "And for that the plaintiff in the early part of the year 1902, acting by its agents, Edgar M. Noel and David W. Thomas, agreed to buy of the defendant, and the defendant, acting by its duly authorized agent, agreed to sell to the plaintiff, twenty-five thousand barrels of Atlas Portland Cement, to be delivered as ordered by the plaintiff on the dock at the Naval Academy grounds at the city of Annapolis, in the State of Maryland, at and for the price of one dollar and twenty cents per barrel, delivered; and the plaintiff in fact says that it was at all times ready and willing to accept and pay for said cement; and that it made frequent demands upon the defendant for the delivery of the same; but that the defendant wholly failed and refused to make said deliveries or to perform any part of its said contract. And the plaintiff further says that because of the said failure and refusal on the part of the said defendant, it was compelled to go into the open market, and purchase, at a price largely in excess of the agreed price aforesaid, to-wit, at the rate of $1.468 per barrel, 25,000 barrels of cement similar to that which the said defendant so as aforesaid sold, but failed and refused to deliver.

"And the plaintiff claims ten thousand dollars ($10,000.)

The defendant filed the general issue pleas, and at the close of the plaintiff's testimony the Court granted a prayer offered by the defendant instructing the jury that there "was no evidence legally sufficient to entitle the plaintiff to recover under the pleadings in the case," and from this ruling the single exception in the record is taken.

It will be necessary to state the facts somewhat at length in order to a proper understanding of the case, but the questions

of law arising thereon are but two in number, and these depend for their solution upon well-established principles.

Sometime in December, 1901, the United States Government had awarded to Edgar M. Noel and David W. Thomas, as associate contractors, a contract for the erection of Midshipmen's Quarters at Annapolis, Maryland, for the sum of $2,448,000, and on January 14th, 1902, the contract was formally executed in writing, the bond required of said contractors by the United States Government, in the sum of $270,000, for payment of the contractors' debts, being then given, and all other requirements of the Government being then complied with. On January 9th, 1902, Noel and Thomas in order the better to enable them to carry out said contract, together with Jacob D. Kline, Moses Pels and J. Kemp Bartlett, formed a corporation under the name of The Noel Construction Company, with a capital stock of $250,000, of which one-half was at once paid up in cash. The certificate of incorporation was duly recorded January 14th, 1902, and on the same day the required *bonus* tax was duly paid to the State of Maryland by the said corporation.

The certificate stated that the corporation was formed for the purpose "of carrying on the business of general contractors; * * * to make, enter into, and perform any and all contracts and agreements with the Government of the United States, State, County and Municipal Governments, and with corporations, firms and individuals; * * * also for the purpose of indemnifying sureties, individual or corporate, upon any bond or bonds required by any of said Governments, guaranteeing the performance of any contract or contracts in which the corporation hereby formed, is or may be interested."

On January 15th, 1902, at the first meeting of the stockholders of the Noel Construction Company, its officers duly elected were authorized to execute in its behalf an agreement of indemnity to the United States Fidelity and Guaranty Company against all loss it might sustain as surety for Noel and Thomas upon the bond of $270,000 guaranteeing the performance of their contract for the erection of said quarters,

and to deposit $50,000 of the funds of the Noel Construction Company with the United States Fidelity and Guaranty Company as collateral security for the performance of said contract of indemnity; also to enter into agreements with sub-contractors of Noel and Thomas guaranteeing the payment of their claims for labor and materials in the prosecution of the work of erecting said quarters; also to enter into such sub-contracts for labor and materials in the erection of said quarters as they might deem for the best interests of the company, and in case any sub-contractors should prefer that their contracts be with Noel and Thomas, as associate contractors, to execute in behalf of the company agreements guaranteeing the payment of the just claims of said sub-contrators under said contracts. These last-mentioned provisions were made because the formal contract with the Government was required to be made with the bidders to whom it was awarded, and could not be made in the name of the Noel Construction Company, and under the provisions of the Federal statutes the bonds given by contractors for government work can be sued on for work and material furnished, it being regarded as doubtful whether those who might contract with the Noel Construction Company could resort to such bonds; thus those who elected to contract with Noel and Thomas as associate contractors could depend upon the bond of the United States Fidelity and Guaranty Company, and those who might contract directly with the company could rely upon the guaranty of the company itself. On the same date, January 15th, 1902, Noel and Thomas entered into an agreement under seal with the Noel Construction Company, reciting the contract of Noel and Thomas with the United States Government, together with the resolution of the Noel Construction Company to execute said contract in behalf of said Noel and Thomas, and proceeded, in consideration of the premises and other good considerations, to assign to the said Noel Construction Company all the right, title and interest of Noel and Thomas in said contract, and in all sums to become due thereunder. Under the Federal statutes, any assignment of a Government con-

tract is voidable at the option of the Government, but the formation of the Noel Construction Company for the purposes stated and the contemplated assignment to it of the contract with Noel and Thomas was commuicated to and considered by the United States Government authorities in charge of this work, and Judge Advocate General Lemley informed Noel and Thomas that the Department had no objection to recognizing such assignment upon condition that Noel and Thomas remain liable to the Government upon their contract, notwithstanding such assignment; that the Noel Construction Company also be deemed liable for the fulfillment of the original contract with Noel and Thomas, and that the United States Fidelity and Guaranty Company be liable for any default, whether said contract be carried on by Noel and Thomas, or by said Noel Construction Company.

Subsequently however, Judge Advocate General Hanna, acting for Judge Advocate General Lemley, thought that there might be some embarrassment to the Government by a formal recognition of the assignment and that it would be best to let it remain a merely tacit recognition.   Consequently no formal recognition of the assignment was made.   This recital of facts will serve to show clearly how complete and thorough was designed to be the substitution of the Noel Construction Company for Noel and Thomas in the execution of this contract, and it will hereafter be shown that knowledge of all these facts was brought home to the Atlas Portland Cement Company when they contracted to deliver the cement in question.

Prior to January 14th, 1902, The Atlas Portland Cement Company had been endeavoring to secure this contract, as appears from a letter or telegram of that date from McClaren, their sales agent, to Noel and Thomas in which he says: "We understand you are now ready to talk cement for your Annapolis contract and will be obliged if you will advise us when it will be convenient to see the writer in reference to this matter." This brought an interview with McClaren in Baltimore on January 31st, 1902, when he submitted the following proposition:

January 31st, 1902.
"Messrs. Noel and Thomas, Baltimore, Md.

We hereby offer to supply you with 25,000 bbls Atlas Portland Cement or what you may require for your contract on dock at Naval Academy, Annapolis, at one dollar and twenty ($1.20) 4 bags to the bbl. subject to the engineer's approval on test, usual rule for bags to be exacted.
        Signed.       The Atlas Portland Cement Company
                                per P. M. McClaren."

To which proposal the following reply was then made,

                        Baltimore, January 31, 1902.
"The Atlas Portland Cement Company
        30 Broad St., N. Y.
    Gentlemen

We hereby accept your Mr. McClaren's proposal to deliver us on dock at Annapolis Naval Academy, approximately 25,000 barrels Atlas Portland Cement, or all that we may require on our contract at said Annapolis Academy, in duck bags, 4 bags to the barrel, at $1.20 per barrel. The usual charge of 10 cts per bag will be exacted. The acceptance of this cement of course, is subject to the engineer's test and approval. Terms 90 per cent in 30 days, or 1 per cent cash in ten days. The cement to be delivered as we may require it on order. This acceptance is subject to a contract which may be mutually agreed upon later. Signed   E. M. Noel
                                and
                        D. W. Thomas"

According to this undisputed evidence, McClaren, who is since dead, dictated this acceptance.

Mr. Noel testified that McClaren came to see him relative to this order several weeks before it was placed, and he then told him before it could be placed it was necessary for them to make some financial arrangements, and that they might form a Construction Company; that at the interview of January 31st he told him the Construction Company was formed, and the contract of Noel and Thomas had been assigned to this company; that they were now ready to give orders, and that McClaren's order was the first one placed and signed. Mr. Thomas was present at that interview, but he too has since died. Testifying in detail Mr. Noel said, "McClaren asked me who the Noel Construction Compay was, and what

it was for.    I told him it was formed for the purpose of finan-
cing this contract for us, and that the contract had been
assigned to the company.    I told him we had authority to
make contracts in the name of Noel and Thomas, for the ben-
efit of the Noel Construction Company, and I had such au-
thority."

On February 6th, 1902, The Atlas Portland Cement Com-
pany wrote Noel and Thomas, saying, "Referring to your ac-
ceptance of our Mr. McClaren's proposal to furnish you with
25,000 bbls Atlas Portland Cement for use on your Annap-
olis contract would say we have been informed that the Noel
Construction Company has been formed and has some con-
nection with your contract.    We would request that you ad-
vise us at your earliest convenience if this information is cor-
rect; and if so, what the relationship is between yourselves
and the above-mentioned company.    Meanwhile we will pre-
pare the contract spoken of in the last paragraph of your letter
above referred to."

On February 11th Noel and Thomas replied, saying: "The
Noel Construction Company has underwritten the contract
and will pay all bills for this work.    Your contract will have
to be written with Noel and Thomas, as the Government will
not recognize any assignment of contracts.    The company
has a capital of $250,000, fifty per cent of which is paid in
cash. I will forward you contracts duly executed by us within
a few days.    You may ship us a cargo of cement whenever
you see fit.    We will be able to take care of it in about two
weeks."

This was acknowledged February 13th saying, "We pre-
sume you will make the company a party to the contract with
us, and awaiting same, we remain, &c."

On February 18th Noel and Thomas wrote: "Our sheds
are built and we are awaiting the cement, and have to request
you will have the same reach here at the earliest possible mo-
ment as this cement has to stand a 28 day test before it can
be used."

On February 19th the Atlas Portland Cement Company

replied: "The contract referred to in yours of 11th and our reply of 13th has not yet come to hand, and we request that you forward same at your earliest convenience.   Immediately we execute a contract with you we will forward cargo as soon as possible."

On February 20th Noel and Thomas wrote saying:   "Our counsel has been out of town until recently, therefore the contract has not been prepared, but will forward same today or tomorrow.   Would say a resolution has been passed by the Noel Construction Company at the stockholders' meeting to become liable for all bills contracted by Noel and Thomas, but this cannot be made a part of your contract, owing to the fact that it might be misconstrued to mean an assignment of the contract, which would violate our contract with the Government.   The Noel Construction Company has underwritten this contract to the Surety Company, which no doubt you know are responsible for all debts contracted by Noel and Thomas.   Please ship us cargo of cement at the earliest possible time.".

February 21st the Cement Company wrote saying:   "In view of the amount of the contract we feel justified in requesting that you forward us for our records a copy of the resolution of the stockholders of the Noel Construction Company.   We will at once proceed to engage a vessel for shipment requested."

February 26th Noel and Thomas forwarded contracts in duplicate for delivery of cement, and promised copy of resolution after next meeting of board of directors of Noel Construction Company, to be held about March 1st.

March 5th the Cement Company wrote: "The form of contract you sent us is not at all satisfactory to us, and it is our intention to submit one drawn by ourselves;" and on March 7th wrote, "As we advised you on the 5th, the form of contract you submitted was not at all satisfactory to us, and we therefore return the two copies to you, and send you a form of agreement we have drawn up.   If same is satisfactory to you please execute and return, and *upon receipt* we will forward you our copy properly executed."

On March 26th Noel and Thomas replied, saying: "Referring to yours of March 7th, we return herewith the contract prepared by you and duly signed by us. Please send us a copy of your contract executed by you, as per your letter."

On March 27th the Cement Company wrote: "We have no record of having received the copy of the resolution mentioned in ours of February 21st and yours of the 26th. We request that you forward it at your earliest convenience, as we expected to have this paper before we executed a contract with you. Your favor of 26th enclosing your signed copy of contract received, and we will await your reply to this letter before forwarding our signed copy."

On April 1st the Cement Company wrote again, saying: "We have not heard from you in reply to ours of March 27th requesting copies of certain resolutions of the Noel Construction Company. In looking over the signed copy of contract you forwarded us March 27th, we note same is signed Edgar M. Noel, David W. Thomas by Edgar M. Noel. We feel same should have signature of Mr. Thomas, or we should have a paper from Mr. Thomas authorizing the signature as stated. We therefore request that you send us copies of resolutions desired, together with such a paper from Mr. Thomas as we have outlined."

On April 2nd Noel and Thomas replied, saying: "A copy of the resolution was forwarded to you yesterday, March 31st, by Mr. Bartlett, of the Noel Construction Company. In regard to the contract being signed Noel and Thomas by Edgar M. Noel, I, of course, have power of attorney from Mr. Thomas to sign his name, otherwise I should not have done so; however, if you desire the contract signed by him, if you will return same I will have it done.

"It appears to me that you are unusually exacting about this contract, and it would seem that you do not want to carry out your proposition as accepted by us through your Mr. McClaren. If such is the case, if you will be frank and tell me so, I will try to purchase the cement elsewhere. I do not care to have further correspondence about the contract."

On April 2nd, after copy of resolutions sent March 31st should in due course of mail have been received, the Cement Company wrote, saying, "We beg to acknowledge receipt of your order, No. ——— of 31st, which will receive our prompt attention."

Here it should be stated that the market price of cement began to rise in February, 1902, and continued to rise until October, 1902, when cement of the quality in question reached $1.99 delivered at Annapolis, and that in April, 1902, the market price at the mills was 95c. per barrel, and if the cost of transportation to Annapolis 52c. be added, the price at Annapolis would be $1.47; that the Noel Construction Company, having other contracts with Government at Annapolis, purchased from the Government for these other contracts, the same sort of cement which the defendant had contracted to furnish the plaintiff, and which same cement the defendant had sold to the Government in October, 1902, at $1.99 per barrel.

In this state of facts, on April 2nd, 1902, and presumably at a later hour in the day than that at which the acknowledgment of the plaintiff's order of March 31st was written, the Cement Company wrote again, saying, "Referring to our correspondence relative to our executing contract with you for the Portland Cement you will require at Annapolis, we have to advise you that we have decided that we will be unable to execute this agreement. Our present position is such, owing to our inability to obtain the necessary cars, that all orders we receive are subject to a delay of about three weeks in shipment from date of receipt, and we therefore do not feel justified in entering into any more new contracts until our shipments have decidedly improved. Regretting that we feel forced to write to you in this manner, we are, respectfully yours."

On April 12th Noel aud Thomas wrote, saying, "We are in receipt of yours of April 2nd by which we understand that you do not propose to carry out your bid and our acceptance of same for cement for Cadets' Quarters at Annapolis. We will try and place this order elsewhere, but we wish it distinctly understood that we propose to hold you responsible for any addititional cost by so doing."

To this, on April 25th, the Cement Company replied, saying, "We are advised and believe that we have made no contract with you to supply the Portland Cement required for your contract for the Cadets' Quarters at Annapolis, and if we have made such a contract with you, we feel justified in refusing to perform it, and therefore will not fulfill the contract, nor accept any liability for any alleged breach thereof."

It is contended by the plaintiff that the contract was formed on January 31st, 1902, by the offer and acceptance of that date, and that the apparent qualification contained in the acceptance contemplated nothing more than a subsequent formal embodiment of an agreement already reached, while the defendant maintains that this clause in the acceptance conclusively shows that an agreement between the parties was never intended to be consummated by the letters referred to of January 31st, 1902, and that it was the clear intention of the parties that the agreement should be in writing and signed by the parties before any contractual obligation should exist.

In *Bonnewell* v. *Jenkins*, L. R. 8 Chan. Div. 70, it is said that a long series of cases has established that *mere* reference to a future contract is not enough to negative a present one; and in a note to *Sanders* v. *Pottlitzer Bros. Fruit Co.*, 29 L. R. A. 431, it is said the decisions upon this subject, while apparently conflicting, are divisible into classes which are quite harmonious and which leave very little actual conflict.

We think however it would serve no useful purpose to determine to which of these classes the case under consideration belongs, because we think there is ample evidence to show that subsequent to January 31st, 1902, a binding contract was formed between the parties, conceding for the purposes of the case that none was formed on that date. In the letter of the Cement Company dated March 7th, 1902, there was tendered to the plaintiff a form of agreement drawn up by the Cement Company in pursuance of the clause providing therefor in the acceptance of January 31st, 1902, and the plaintiff was told if same was executed by it and returned to defendant, it would forward its copy properly executed. This agreement was duly

executed by the plaintiff and returned to the defendant, who retained it but never did forward according to promise its own copy signed by it.   We think that the letter of March 7th enclosing and referring to the form of agreement, was as valid an execution of the contract by the defendant, as if duplicates had been enclosed, both duly signed by it, as soon as the plaintiff had signed and delivered one of these duplicates. There is no magic as to the place of signing, and we think the defendant was as effectually bound by the letter forwarding the form for plaintiff's signature, as it would have been by an actual signing of the duplicate form.   The defendant could not free itself from the obligation thus imposed, by its own failure to sign and forward its own copy of its own agreement, based upon the flimsy pretexts contained in its letters of March 27th and April 1st.

Nor can we entertain any doubt that the plaintiff is entitled to sue upon the contract.   The defendants were apprised at the time of the offer and acceptance of January 31st, 1902; that Noel and Thomas in purchasing the cement were acting as the agents of the Noel Construction Company.   Their first letter of February 6th shows that their agent, Mr. McClaren, communicated to them the information upon that point given him by Noel, and all the subsequent correspondence between the parties shows that the defendant understood that Noel and Thomas were acting throughout as agents for the Noel Construction Company.   This, however, bears only upon what may be termed the moral aspect of the case, since in law it was not necessary that the defendant should know that Noel and Thomas were acting as the plaintiff's agent.   In 2 *Page on Contracts*, sec. 960, it is said "If the facts exist which in law create the relation of principal and agent, such relationship exists, though the parties may not have intended such facts to have such legal effect."   The right of a principal to sue on an agent's contract does not depend upon the defendant's knowledge or ignorance of the agency.   The Maryland cases are clear to this effect, and such is the general doctrine. In *Oelrichs & Lurman* v. *Ford*, 21 Md. 501, this Court said:

"The right of a principal to maintain an action on a written contract made by an agent in his own name, without disclosing the name of the principal, although formerly sometimes questioned, is now well settled." And in *Balt. Coal Tar & Manufacturing Co.* v. *Fletcher & Murdock*, 61 Md. 295, it is said : "Though the contract may have been in the name of the agents, if it was made for and on behalf of, and for the benefit of the plaintiffs, it may be sued on and enforced by the plaintiffs, notwithstanding the agents or one of them may have furnished the money for the purposes of the contract."

There is no difficulty arising from the fact that the draft of the agreement sent by the defendant and signed by Noel and Thomas concludes "witness our hands and seals," and is only signed and not sealed by them. The acceptance of January 31st did not stipulate for an agreement under seal, and the defendant had no right to add, another term to that stipulation without the consent of Noel and Thomas. Moreover, the defendant accepted without objection the draft signed by Noel and Thomas, without being sealed, and while of course it was not effective as a deed, without seals, it was effective as a simple agreement or contract conforming precisely to the stipulation of the acceptance for a *"contract."* The undisputed testimony shows that after every reasonable effort to purchase elsewhere the cement which defendant refused to deliver, the plaintiff was forced to pay $1.97 per barrel for cement of like quality, making a loss to it of $6,750, to which extent the plaintiff was injured by the ruling of the Court upon the prayer granted.

It follows from what we have said that the judgment must be reversed.

*Judgment reversed and new trial awarded with costs to the appellant above and below.*

(Decided March 27th, 1906.)