275 F.2d 57
 79 A.L.R.2d 836
 UNITED STATES of America, for the use and benefit of
WESTINGHOUSE ELECTRIC SUPPLY COMPANY, Appellant,
v.
ENDEBROCK-WHITE COMPANY, Inc., and Aetna Casualty & Surety
Company, Appellees.
 No. 8022.
 United States Court of Appeals Fourth Circuit.
 Argued Jan. 20, 1960.
Decided Feb. 26, 1960.
 
 1
 William C. Coupland, Norfolk, Va. (Jett, Sykes & Coupland, Norfolk V., on brief), for appellant.
 
 
 2
 Rutherford C. Lake, Jr., Newport News, Va. (William E. Allaun, Jr., and Newman & Allaun, Newport News, Va., on brief), for appellees.
 
 
 3
 Before BOREMAN, Circuit Judge, and PAUL and BARKSDALE, District Judges.
 
 
 4
 BARKSDALE, District Judge.
 
 
 5
 This action was instituted under the provisions of the Miller Act, 40 U.S.C.A. 270a-270d, in the name of the United States for the use of Westinghouse Electric Supply Company, against Endebrock-White Company, Inc., and Aetna Casualty and Surety Company, for recovery of the purchase price of certain materials furnished to Mechanical Engineering Corporation, now a bankrupt, alleged to have been furnished in the prosecution of the work on a government project at Fort Eustis, Virginia, known as the Officers' Open Mess and Swimming Pool. Endebrock was the prime contractor on this and other government projects in that vicinity, and Mechanical was a subcontractor on this and other projects. Aetna executed the required payment bond in behalf of Endebrock. Mechanical was not required to give bond. Westinghouse had no contractual relationship, express or implied, with Endebrock. Therefore, its right to recover depends upon whether or not it complied with 40 U.S.C.A. 270b(a) which required it to give a written ten notice of its claim to Endebrock 'within ninety days from the date on which such person * * * furnished or supplied the last of the material for which such claim is made, * * *'.
 
 
 6
 The original confirmed order from Mechanical to Westinghouse for materials was completed, and the last of the materials delivered, on October 16, 1957. Westinghouse contends that, because Mechanical's records show that this last shipment and others were entered as received on November 11th, that date, rather than October 16th, should be the controlling date for the beginning of the statutory ninety-day period as to the original order. However, it appears that Mechanical had sanctioned the practice of having Endebrock's employees accept and give receipts for materials consigned to it, and that an employee of Endebrock did in fact sign a receipt for the last delivery of the original order on October 16th. We therefore agree with the district judge that the controlling date for the beginning of the statutory ninety-day period as to the original order was October 16th.
 
 
 7
 Westinghouse gave a notice by registered mail, dated January 15, 1958, which was received by Endebrock on January 16, 1958, claiming $3,962.51 as the amount due for materials on that date. If it be assumed that October 16, 1957, was the date of the last delivery of the materials by Westinghouse to Mechanical, that notice came too late, because ninety-one days had elapsed before the notice was written, and ninety-two days had elapsed before the notice was received by Mechanical.
 
 
 8
 However, on February 18, 1958, another registered letter was mailed by Westinghouse to Endebrock claiming a balance due as of January 31, 1958, of $3,964.62, an increase of $2.11 over the amount as stated in the original notice. This amended notice increasing the amount claimed by $2.11 was given, due to the fact that, on December 31, 1957, on Mechanical's purchase order, Westinghouse delivered to Mechanical certain bushings in the amount of $2.11, which Westinghouse alleges it reasonably believed were for the Officers' Open Mess and Swimming Pool project. Admittedly, an over-the-counter purchase at Norfolk was made by Mechanical of Westinghouse on December 31, 1957, and as claim for the balance due it, including the $2.11 item, was made by registered mail, in compliance with the statute, within the period of ninety days from December 31, 1957, the controlling question in the case is whether or not the bushings in the amount of $2.11 were supplied for use in the prosecution of the work on this particular project, or were reasonably believed by Westinghouse to be intended for such use.
 
 
 9
 The circumstances surrounding the purchase and delivery of the bushings are these: Neighbors, a foreman of Mechanical, needed bushings for the Heliport job, not related to the Officers' Open Mess project with which this controversy is involved, so he telephoned to Robert Simons, an employee in Mechanical's Norfolk office, requesting that he procure the bushings from Westinghouse and send them to him. It was Neighbor's custom to tell Simons for what job he wanted materials, so he assumed that he did so in this instance. Simons filled out a 'Local Purchase Order' to Westinghouse for the bushings, on a form in use by Mechanical, bearing the printed signature of Mechanical 'By R.E.S.', Simons' initials. Underneath the number of the purchase order, there appeared the number '52915', which was the number of the Officers' Open Mess project. Mechanical's pickup man took the purchase order and presented it to an employee of Westinghouse at its warehouse. Mechanical's credit was bad, so Westinghouse had instructed its warehouse to deliver it no merchandise in any amount except on bonded jobs, so if this purchase order had not borne the number of a bonded job, it would have been contrary to his orders for the employee of Westinghouse to deliver the bushings. The employee of Westinghouse made out a sales ticket, also bearing the project number 52915, showing the purchase price of the bushings to be $2.11, had Mechanical's pickup man sign the sales ticket, and delivered the bushings to him. The bushings were actually used on the Heliport job, but there was no evidence of anything to put Westinghouse on notice that the bushings were not intended for the job whose number, 52915, appeared on the purchase order.
 
 
 10
 Upon these facts, the district judge held that Westinghouse had not borne its burden of proof, and rendered judgment for the defendants. From this judgment plaintiff has prosecuted this appeal. In his memorandum the district judge said:
 
 
 11
 'The burden remains upon the materialman to prove that the materials were used in prosecution of the work provided for in the prime contract and, at the time of sale of the disputed item, there must be a reasonable belief that it was intended for ultimate use under the prime contract.'
 
 
 12
 We are of the opinion that the district court erred in its conclusion that the use plaintiff had not borne its burden of proof, and therefore could not recover. A court's findings of fact should not be set aside 'unless clearly erroneous', and we do not find it necessary to hold that the court's findings of fact were clearly erroneous: what we do find is that the court imposed too great a burden of proof upon the use plaintiff, a burden not sanctioned by the law. The district court imposed upon the use plaintiff, not only the burden of proving its reasonable belief that the bushings were intended for ultimate use under the prime contract, but the additional burden of proving that the materials were actually so used. We hold that, in order to recover under the Miller Act, it is not required of the materialman that he prove that his materials were actually used in the prosecution of the work of the prime contract, but only that in good faith he reasonably believed that the materials were so intended.
 
 
 13
 As authority for its conclusion that, besides the burden on the use plaintiff of proving reasonable belief that the material furnished was intended for ultimate use under the prime contract, 'The burden remains upon the materialman to prove that the materials were used in prosecution of the work provided for in the prime contract', the district court cited St. Paul-Mercury Indemnity Co. v. United States, 10 Cir., 238 F.2d 917, 925. There is language in this opinion tending to support the conclusion of the district judge. However, this language is dicta and goes far beyond what the court actually decided. There the use plaintiff proved that one item claimed was for miscellaneous services furnished to the prime contractor including service station, shop and rental services. The court said, at page 925:
 
 
 14
 'The account may have included some items that went to Barfield (prime contractor) for use in the performance of the prime contracts which were not included in the reasonable value of the services performed under the subcontract, but the total of these items cannot be established by striking a book balance between the prime contractor and subcontractor for all their activities, including those admittedly outside the contract.'
 
 
 15
 The basis of the decision was that proof of indebtedness of the prime contractor to the subcontractor, some of which may have been intended for use in performance of the prime contract, and some of which were for other activities outside the contract, with no evidence to establish which was which, would not justify a recovery under the Miller Act. No question of 'reasonable belief' was involved in the case.
 
 
 16
 It is our opinion that the correct rule is aptly stated in United States for Use of Color Craft Corporation v. Dickstein, D.C., 157 F.Supp. 126, 132, as follows:
 
 
 17
 'The Miller Act is highly remedial in character and is entitled to a liberal construction and application in order properly to effectuate the Congressional intent to protect those who furnish labor or materials for public works. Glassell-Taylor Co. v. Magnolia Petroleum Co., 5 Cir., 153 F.2d 527, and cases cited therein. In accord with this policy and in view of the reasons discussed above, it is the opinion of this Court that as against the prime contractor a materialman may recover under the Miller Act where he has sold and delivered material to the subcontractor in good faith and under the reasonable belief that it was intended for ultimate use under the prime contract. Neither delivery of the material to the prime contract job site nor actual incorporation of the material into the work is required. But here the evidence shows that the paint was actually incorporated into the work. Use plaintiff's right to recover seems plain and clear to me.'
 
 
 18
 See also Fourt v. United States, 10 Cir., 235 F.2d 433, in which the court said at page 435:
 
 
 19
 'The provisions of the Miller Act, Title 40 U.S.C.A. 270a et seq., requiring persons holding contracts with the United States for the construction, alteration and repair of any public building or public work to furnish bond for the protection of the persons supplying labor and material, is to be liberally construed to carry out its purpose. See Standard Accident Insurance Co. v. United States for Use and Benefit of Powell, 302 U.S. 442, 58 S.Ct. 314, 82 L.Ed. 350; MacEvoy Co. v. United States, for Use and Benefit of Calvin Tomkins Co., 322 U.S. 102, 104, 64 S.Ct. 890, 88 L.Ed. 1163, and Brogan v. National Surety Co., 246 U.S. 257, 38 S.Ct. 250, 62 L.Ed. 703.
 
 
 20
 'The Miller Act Permits recovery when the materials have been furnished in the prosecution of the work and does not require that the labor or material furnished be actually used or incorporated into the contract work. See Illinois Surety Co. v. John Davis Co., 244 U.S. 376, 37 S.Ct. 614, 61 L.Ed. 1206; United States Fidelity & Guaranty Co. v. United States, 231 U.S. 237, 34 S.Ct. 88, 58 L.Ed. 200; Title Guaranty & Trust Co. of Scranton, Pa. v. Crane Co., 219 U.S. 24, 31 S.Ct. 140, 55 L.Ed. 72.'
 
 
 21
 In Glassell-Taylor Company v. Magnolia Petroleum Company, 5 Cir., 153 F.2d 527, 529, the subcontractor undertook to furnish sand and gravel to the prime contractor for use in the building of an airdrome. In this work, the subcontractor used a fleet of trucks, which of course required gasoline and oil. The gasoline and oil were procured from the use plaintiff. In the mornings, after procuring the necessary gasoline and oil, the trucks 'were then dirven to the airdrome site to ascertain if any material was needed. If there was hauling to be done the trucks would then go to one of the pits and haul the type of material the foreman or engineer was ready to use. If there was not work the truck driver went wherever he pleased and burned the gasoline and oil as he saw fit, either to work at another job or to travel at his pleasure.' Although obviously some of the gasoline and oil furnished by the use plaintiff was not used in the prosecution of the contract, the court allowed recovery for the full amount of such gasoline and oil furnished. The court said at page 529:
 
 
 22
 'And deliveries were made under circumstances which fully justified the use plaintiff in believing not only that they would be, but that they were in fact, used by the subcontractor in the fulfillment of his contractual obligation. Whether or not the materials were wholly consumed 'in the prosecution of' the work provided for in the contract and bond is not controlling. What is important is the fact that these materials were 'supplied' to the subcontractor in the prosecution of the work provided for.'
 
 And further, at page 530, the court said:
 
 23
 'Under the facts of this case it would be manifestly unjust to hold that the use plaintiff, which had in good faith supplied the subcontractor with materials indispensable to the prosecution of the work, and which had complied with the jurisdictional prerequisites essential to the bringing of suit could be defeated in its action on the payment bond because some of the material beyond its disposition and control was in fact diverted to private use. Under the facts in this case it did not lie within the power of the use plaintiff to protect itself against the happening of such an event. * * *'
 
 
 24
 The above case was cited with approval in Commercial Standard Insurance Co. v. United States for Use of Crane Company, 10 Cir., 213 F.2d 106, 108.
 
 
 25
 The latest case on the question here under consideration which has come to our attention is United States for Use and Benefit of J. B. Byrne & Co. v. Fire Association of Philadelphia, 2 Cir., 260 F.2d 541. There the prime contract was for excavation work on the Grass River Lock, a part of the St. Lawrence Seaway project. Heavy earth-moving motor equipment was required, and by reason of the abrasive nature of the earth at the site, the steeply inclined road, and the fact that much of the work was done during sub-zero weather, unusual wear on the tires resulted. From the inception of the contract, the repair and replacement of tires was expected to be, and was, a constantly recurring item. The use plaintiff's claim was for the repair and replacement of tires on the earth-moving equipment. Defendant contended that the burden was on plaintiff to show that the tires were substantially consumed by the work, and that it was not liable for tires which were diverted by the contractor for use on non-bonded jobs. In overruling defendant's contentions and approving a judgment for the use plaintiff, the court said, at page 545:
 
 
 26
 'The construction sought by appellant creates other difficulties. Thus requiring the supplier to trace specific materials after they have left his control may often place upon him an impossible burden of proof even when the items involved were in fact consumed. Moreover, even if appropriate tracing measures could be devised, the courts, in enforcing one remedial policy, should be hesitant to compel an industry to accept what may be artificial and burdensome accounting practices. But these problems aside, the policy of the Miller Act dictates that an exception ought not to be carved out of the surety's liability for materials not actually consumed. For the statutory bond is of value to materialmen in our credit economy only as its coverage is predictable at the time the contract for the materials is created. Businessmen look to more than the contents of their cash registers in conducting their affairs. If, because the surety's liability is held suspended until the goods are consumed, the bond has little effect on the degree of certainty with which the supplier can expect to receive the purchase price of the materials sold or to be sold under the contract, it little aids the financial position of the persons Congress sought to benefit.
 
 
 27
 'These same considerations apply with equal vigor to appellant's final assertion-- that its liability on the bond does not extend to materials which the contractor innocently or fraudulently diverts from the bonded work to another project. Accordingly, it would be inconsistent with the preceding discussion to enlarge the holdings of past cases which have relieved the surety of his obligation only in circumstances where the supplier, at the time the materials were furnished, had constructive knowledge of the contractor's intended use of them. St. Paul-Mercury Indemnity Co. v. United States for Use of Jones, 10 Cir., 238 F.2d 917, 924-925; United States for Use of Westinghouse Electric Supply Co. v. Fourt, D.C.W.D.Okl., 131 F.Supp. 584, 585, affirmed Fourt v. United States, for Use of Westinghouse Electric Supply Co., 10 Cir., 235 F.2d 433.'
 
 
 28
 Since the evidence clearly establishes that Westinghouse furnished the bushings to Mechanical on December 31, 1957, in good faith and under the reasonable belief that they were intended for use in the prosecution of the work on the Officers' Open Mess and Swimming Pool, Project No. 52915, there being no question of the fact that notice in compliance with the Act was given within ninety days thereafter, it follows that the judgment of the district court for the defendants must be reversed and remanded with directions that a judgment be rendered for the use plaintiff in the amount sued for.
 
 
 29
 Reversed and remanded.