**UNITED STATES of America For the Use and Benefit of LABORATORY FUR-NITURE CO., Inc.**

v.

**RELIANCE INSURANCE COMPANY.**

**Civ. A. No. 65-236-G.**

United States District Court

D. Massachusetts.

Sept. 30, 1967.

James G. Walsh, Jr., James M. Mc-Donough, Boston, Mass., for plaintiff.

Stanley S. Ganz, Ganz, Ham & Homans, Boston, Mass., for defendant.

OPINION

*Findings of Fact*

GARRITY, District Judge.

1. This is a Miller Act case brought under 40 U.S.C. §§ 270a–270d by the United States for the benefit of a subcontractor against the performance bond surety of Edward R. Marden Corp. ("Marden"), which as prime contractor built a physics laboratory for the United States Army Engineers (the "owner") at Hanscom Airfield, Bedford, Massachusetts. The use plaintiff, Laboratory Furniture Co., Inc. (hereinafter called the plaintiff) on June 5, 1962 entered into a subcontract with Marden whereby it was to do all the work required under a certain part of the main contract, in particular the furnishing and installation of laboratory equipment service strips and fume hoods. The contract price, adjusted by job changes 11, 12 and 37, was $34,845. The plaintiff was paid only $15,000 and sued on March 23, 1965 for the balance of $19,845. The defendant pleaded non-performance by the plaintiff, damages for delay and expenses of completion and the statute of limitations. The case was tried by the court without a jury.

2. Previous to the plaintiff's delivery of materials to the job site, which began in July 1963, a question of interpretation of the contract arose with respect to the installation of two fume hoods located in Room 33 of the building known as the ultra-pure wing. At the time of submitting its bid, the plaintiff advised Marden that it interpreted the contract specifications and drawings as requiring no work by the plaintiff in Room 33 and Marden agreed with this interpretation. However, during 1963 the owner, whose decision under Article 15 of the subcontract was final, ruled that the subcontract did require their installation. Eventually, on July 27, 1964, after much discussion in which the plaintiff participated, the owner decided to eliminate them by job change 39 in exchange for a reduction in the prime contract price of $2,814. The plaintiff at all times insisted that its subcontract did not call for this item.[1]

3. The plaintiff delivered materials to the job and installed them during the late summer and fall of 1963 and applied to Marden for progress payments. Invoices of the plaintiff dated August 16 and September 20, 1963 stated 100% as the percentage of completion of deliveries of material. Its invoice dated December 31, 1963 stated that the job had been completed 100%. It applied for final payment on January 30, 1964, claiming a balance due of $20,584.

4. Meanwhile, other questions of subcontract interpretation arose between the plaintiff and Marden. The principal dispute related to pipe chases, which are metal pipe enclosures or coverings installed over plumbing, electrical and other conduits for safety and appearance. The plaintiff took the position that the pipe chases were not covered by its subcontract. The other disagreement had to do with certain electrical fixtures, called metal surface raceways, to be installed on so-called "B" laboratory strips.[2] On January 15, 1964 Marden entered into a subcontract with another company for installation of the pipe chases. In January or February 1964 Marden employed another company to put in the surface raceways. Marden's only payment to the plaintiff was on November 7, 1963 in the sum of $15,000. On November 27, 1963 Marden notified the surety on the plaintiff's performance bond, Aetna Insurance Company ("Aetna"), that it had withheld $7,417 from its payments to the plaintiff as a reserve for disputed work items.

5. In February 1964 the plaintiff turned the matter over to its attorney, who on March 20, 1964 wrote a letter to Marden demanding arbitration under Article 19 of the subcontract as to payment of the balance allegedly due, determination of the responsibility for installing two fume hoods in Room 33 and the other disputed work items. Marden responded on March 25, 1964 by notifying the plaintiff that, in accordance with Article 7, it terminated the subcontract.[3] Counsel's demand for arbitration crossed in the mails with a letter from Marden to the plaintiff also dated March 20 enclosing a copy of a "punch list" received from the owner following an inspection of the job and enumerating alleged, minor deficiencies in the plaintiff's performance of the subcontract. Marden's letter asked the plaintiff to correct them, but the plaintiff took no action and Marden employed another company to do most of this work.

6. After termination, Marden addressed several letters to Aetna, the plaintiff's bonding company, regarding various aspects of the subcontract, sending

1. For example, on February 27, 1964 the plaintiff wrote to Marden, "We have performed that work which we contracted to do and will not accept these charges which you are attempting to foist upon us."

2. Because of its decision on the statute of limitations issue and the possible pendency of other litigation between the plaintiff and Marden, the court does not rule upon the merits of the disputes regarding fume hoods, pipe chases and surface raceways.

3. The court makes no finding whether Marden's termination of the subcontract was warranted under the circumstances.

copies to the plaintiff. This correspondence dealt mainly with job changes as to which the owner had not then made a final decision. Meanwhile, the parties to the subcontract, their attorneys and bonding companies attempted to adjust the disputes, but without success.

7. On April 27, 1964 Marden wrote to Aetna that it had been informed by the owner of a deficiency which had not been mentioned in the punch list sent to the plaintiff on March 20, small, plastic identification buttons for various faucets and nozzles in the laboratory. They varied in color depending on the material supplied through the particular nozzle, e. g., helium, oxygen, air, water, and identifying words were printed on them. They were essential for the operation of the laboratory, both for the safety of personnel and for a finished appearance. Some grey buttons for helium were missing, and some green ones for cold water. The word "oxygen" had been marked on green buttons instead of on brown ones. Marden's letter stated, "It is necessary that this work, as well as the other deficient items, be completed immediately. Please notify this office as soon as possible what arrangement you are making to complete this work." Marden sent a copy of this letter to the plaintiff. On July 10, 1964 the plaintiff wrote to Aetna, with a copy to Marden, that the missing buttons had been received by its Boston representative and would be taken care of the following week.

8. On July 16, 1964 the plaintiff's local representative, Marino, brought the identification buttons, about 30 in number, to the premises, which were by then occupied by the owner. Marino snapped them into place on the proper faucets.[4]

They were for the most part replacements for buttons which had been on the faucets originally delivered to the premises in July or August, 1963.[5] It is not unusual for such buttons to fall out or to be accidentally knocked out by plumbers in the course of connecting the faucets to pipes. No invoice or statement was ever prepared by anyone covering the replacement of the missing identification buttons.

9. Suit was commenced by the plaintiff on March 23, 1965. The only labor or material alleged by the plaintiff to have been supplied in connection with its subcontract within the previous year is the installation of the missing buttons on July 16, 1964. The defendant pleaded the statute of limitations.[6] The final inspection of the prime contract by the owner did not occur until August, 1964 and final settlement of the contract did not occur until later.

*Conclusions of Law*

1. The dispositive issue is whether the plaintiff performed labor or supplied material to the job within the meaning of 40 U.S.C. § 270b(b) when Marino replaced the missing identification buttons in July, 1964. That the buttons were minor and inexpensive items is not important. United States for Use and Benefit of P. A. Bourquin v. Chester Const. Co., 2 Cir., 1939, 104 F.2d 648. The effect of furnishing punch list items is discussed in United States for Use and Benefit of Austin v. Western Electric Co., 9 Cir., 1964, 337 F.2d 568, 572–575, where the court held that the test is whether the materials were supplied for the purpose of completing the subcontract as distinguished from correcting defects and

---

4. On the same visit, Marino also touched up some scars on some furniture supplied by the plaintiff which had been scratched by workmen who had subsequently worked on the premises.

5. Marino, who was in charge of the installation of the equipment supplied by the plaintiff, testified that, whenever he had been on the premises, he always noticed that some of the faucets had identification buttons missing. He was not

asked to hazard a guess as to their number.

6. In its answer, the defendant alleged that suit had been filed more than one year after the date of final settlement of the contract. This was the standard previous to the 1959 amendment of 40 U.S.C. § 270(b). However, the case was tried and argued on the basis of § 270b(b), as amended.

making repairs following an inspection. Accord: United States for Use of General Electric. Company v. Gunnar Johnson & Son, Inc., 8 Cir., 1962, 310 F.2d 899, 903. In General Electric Co. v. Southern Construction Co., Inc., 5 Cir., 1967, 383 F.2d 135, the court enlarged the period of limitations applied in the Western Electric Co. case by holding that the last material supplied need not be material for which claim is made. Another example of decisions stressing the remedial role of the Miller Act is United States for use and benefit of Westinghouse Electric Supply Co. v. Endebrock-White Co., 4 Cir., 1960, 275 F.2d 57, 60 A.L.R.2d 836, which held that material supplied by a subcontractor may satisfy Section 270b(b) even though never used in the construction of the project.

2. It may be asked, how can the purpose for which the materials were supplied, whether for the original performance or for correcting deficiencies, be controlling when Section 270b(b) makes no reference to purpose? The answer lies in the first clause of subdivision (a) which defines the labor or material to which the entire subsection relates and impliedly specifies purpose in describing the labor or material as furnished "in the prosecution of the work provided for in such contract." But is it appropriate to rely upon the language of subdivision (a), especially since the recent General Electric Co. case held that "there is nothing ambiguous or doubtful about the language" of subdivision (b) and that the court below erred in construing it in *pari materia* with subdivision (a)? Yes, in the court's opinion, because the problems are quite different.[7] The phrase involved in the General Electric Co. case, "for which claim is made," is not basic to the entire section and appears in provisions dealing specifically with notice. The qualifying "purpose" language at issue in this case is incorporated by reference into subdivision (b) by the words, "Every suit instituted under this section * * *" and "* * * but no such suit shall be commenced * * *."

3. The key facts are that the identification buttons were supplied (a) as replacements for those furnished during the original performance of the subcontract; (b) seven months after the plaintiff had performed the subcontract completely; (c) four months after termination of the contract by the defendant; and (d) as a result of a request by the defendant addressed not to the plaintiff but to the surety company on plaintiff's performance bond.[8] It follows that they were not furnished "in the prosecution of the work" within the meaning of 40 U.S.C. § 270b(a). The court concludes that they were furnished as a credit against the reserve for disputed items which was being withheld by Marden and which had been the subject of plaintiff's demand for arbitration and claim against Marden's bond; and that when Marino went to the premises with the buttons in July, 1964 he went as agent for Aetna.

4. The plaintiff has argued that the buttons were supplied in completion of the subcontract because, under Article 16, it remained fully responsible for the work until final approval by the owner and final approval was not given until after the buttons had been replaced. This argument overlooks the defendant's termination of the subcontract on March 25, 1964. Whether or not the defendant's termination was justified, as to which the court has made no finding, there was no longer any contract in the sense of an agreement between the parties. Moreover, after March 25 both parties acted in

7. None of the Courts of Appeals which have formulated the test of purpose has considered the point sufficiently doubtful to warrant discussion.

8. Aetna twice protested Marden's sending it letters relating to the work, once in response to Marden's request for the identification buttons. In that letter, dated May 6, 1964, Aetna stated, "In the meanwhile, similar to the action you have taken in writing us, Laboratory Furniture Company has given us copies of letters that it has addressed to your Surety, Reliance Insurance Company, whereby it makes claim against your bond."

reliance upon the termination. The defendant addressed all correspondence to Aetna and employed another company to correct some of the punch list deficiencies which had been the subject of Marden's letter to the plaintiff dated March 20. The plaintiff did not undertake to do this punch list work. Also, when plaintiff procured the replacement buttons, it reported this in a letter addressed to Aetna rather than to Marden.

5. Judgment will be entered for the defendant on the ground that suit was commenced after the period of limitations provided in 40 U.S.C. § 270b(b), as amended.