RAY ET UX. *v.* EURICE ET AL.

[No. 39, October Term, 1952.]

*Decided December 5, 1952.*

The cause was argued before MARKELL, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*W. Edward Plitt,* for appellants.

Submitted on the record by *Maguire and Brennan* for appellees.

HAMMOND, J., delivered the opinion of the Court.

In an action in the Circuit Court for Baltimore County by the owners of an unimproved lot against a construction company for a complete breach of a written contract to build a house, the court, sitting without a jury, found for the defendant and the plaintiffs appealed.

Calvin T. Ray and Katherine S. J. Ray, his wife, own a lot on Dance Mill Road in Baltimore County. Late in 1950, they decided to build a home on it, and entered into negotiations with several builders, including William G. Eurice & Bros., Inc., the appellee, which had been recommended by friends. They submitted stock plans and asked for an estimate—not a bid—to see whether the contemplated house was within their financial resources. John M. Eurice, its President, acted for the Eurice Corporation. He indicated at the first meeting that the cost of the house would be about

$16,000. Mr. Ray then employed an architect who redrew the plans and wrote a rough draft of specifications. Mr. Ray had copies of each mechanically reproduced, and in January, 1951, arranged a meeting with Mr. Eurice to go over them so that a final bid, as opposed to an estimate, could be arrived at. In the Ray living room, Mr. Ray and Mr. John Eurice went over the redrawn plans dated 9 January 1951, and the specifications prepared by the architect, consisting of seven pages and headed "Memorandum Specifications, Residence for Mr. and Mrs. C. T. Ray, Dance Mill Road, Baltimore County, Maryland, 9 January, 1951", and discussed each item. Mr. Eurice vetoed some items and suggested change in others. For example, foundation walls were specified to be of concrete block. Mr. Eurice wanted to pour concrete walls, as was his custom. Framing lumber was to be fir. Mr. Eurice wanted this to be fir or pine. In some instances, Mr. Eurice, wanting more latitude, asked that the phrase "or equivalent" be added after a specified product or brand make. All the changes agreed on were noted by Mr. Ray in green ink on the January 9th specifications, and Mr. Eurice was given a set of plans and a set of the specifications so that he could make a formal bid in writing. On February 14, the Eurice Corporation submitted unsigned, its type-written three-page proposed contract to build a house for $16,300 "according to the following specifications". Most of the three pages consisted of specifications which did not agree in many, although often relatively unimportant, respects with those in the January 9th seven-page specifications. Mr. Ray advised Mr. Eurice that he would have his own lawyer draw the contract. This was done. In the contract, as prepared and as finally signed, the builder agrees to construct a house for $16,300 "strictly in accordance with the Plans hereto attached and designated residence for Mr. and Mrs. C. T. Ray, Dance Mill Road, Baltimore County, Maryland, Sheets 1 through 7 dated 9 January 1951 * * *

and to supply and use only those materials and building supplies shown on the Specifications hereto attached and designated Memorandum Specifications—Residence for Mr. C. T. Ray, Dance Mill Road, Baltimore County, Maryland, Sheets 1 through 5 dated 14 February 1951 it being understood and agreed that any deviation from the said Plans shall be made only with the prior assent of the Owner. Deviations from the Specifications shall be made only in the event any of the items shown thereon is unavailable at the time its use is required, and then only after reasonable effort and diligence on the part of the Builder to obtain the specific item has failed and the owner has given his prior approval to the use of a substitute item."

The Memorandum Specifications referred to in the contract, consisting of five pages and dated 14 February 1951, had been prepared by Mr. and Mrs. Ray, the night of the day the Eurice Corporation delivered its three-page proposal, and after Mr. Ray had said that his own lawyer would draw the contract. On the 14th of February the 9 January seven pages, as they had emerged from the green ink deletions and additions made at the meeting in January, were retyped and from the stencil so cut at the Ray apartment, Mr. Ray had many copies mechanically reproduced at the Martin Plant where he is an aeronautical engineer. The rewritten specifications were identified as they are designated in the contract, namely as "* * * Sheets 1 through 5, dated 14 February 1951."

On February 22, at the office of the Eurice Corporation, on the Old Philadelphia Road, the contract was signed. Present, at the time, were Mr. Ray—Mrs. Ray was absent and had signed the contract earlier because she could not get a baby-sitter—Mr. John Eurice and Mr. Henry Eurice, who is Secretary of the Eurice Corporation. Mr. Ray relates the details of the meeting, as follows:

"I had copies, plans and specifications before me, as well as two copies of the contract. We

sat down, Mr. John Eurice and I sat down and went over all of the items in the specifications. I volunteered to show him I had in fact changed the specifications to reflect their building idiosyncrasies, such as wanting to build the house with a poured cellar. We also went over the contract document item by item. Following that, we each signed the contract and Mr. Henry Eurice, being the other party there at the time, witnessed our signature. He was in the room during the entire discussion or review of the contract."

After the contract had been signed, Mr. Ray says he asked that the Eurice brothers help him fill out the F.H.A. form of specifications (required to obtain the mortgage he needed) since he was not familiar with the intricacies of that form. This they did, with Mr. Henry Eurice giving most of the aid. They used the memorandum specifications of 14 February where they corresponded with the F.H.A. form and in other instances, as where the memorandum specifications were not adequate, Mr. Henry Eurice gave the necessary information. After the F.H.A. specifications were completed, the meeting broke up and a copy of the signed contract and copies of the Plans and Specifications were retained by the Eurice Corporation.

Mr. Ray then obtained a loan from the Loyola Savings & Loan Association. To do this it was necessary that he furnish it with his copy of the contract as well as copies of the Plans, the specifications of 14 February and the F.H.A. specifications. Neither the plans nor specifications which were left with the Building Association were signed by the Eurice Corporation, nor, through a misunderstanding, had they been signed by either Mr. or Mrs. Ray. When they applied for the loan, Mr. and Mrs. Ray did sign the reverse side of each page of the drawings and of the contract specifications. Thereafter, in response to a call from the Building Association, Mr. John Eurice went to its office and

signed the reverse side of each page of the contract, each page of the specifications of the five-page specifications of February 14, referred to in the contract, and each page of the plans dated January 9, and referred to in the contract, although he says that he did not look at any of these prior to signing them.

Settlement of the mortgage loan was made on April 19 and thereafter, Mr. Ray phoned Mr. John Eurice repeatedly in order to set a starting date for the construction work. He finally came to the Ray home on April 22 and indicated that he would start construction sometime about the middle of May. Other details of the work were discussed and Mr. Ray was given the names of a plumber and a supply company so that he could pick out and buy direct various products which would be incorporated in the house. Mr. Eurice, at that time, brought up the question of a dry well which had not been noted in the specifications, and which was required by the Baltimore County Building Code, and Mr. Ray agreed that he would make allowance for this, as he felt it was an honest mistake.

On May 8, Mr. Ray received urgent messages from the Eurice Corporation that his presence was desired for a conference. As he walked into the office, Mr. Henry Eurice picked up the drawings, specifications and the contract, and threw them across the desk at him, and onto the floor, with the announcement that he had never seen them, and that if he had to build according to those specifications he did not propose to go ahead. Attempts were made at the meeting to iron out the differences which apparently caused Mr. Henry Eurice to state that he would not live up to the contract. A second meeting was held at the Ray apartment several days later, and these efforts were continued by Mr. John Eurice, and that was the last contact that the Ray family had with any officer or agent of the Eurice Corporation. Realization that to build according to contract specifications would cost more than their usual "easy going, hatchet and saw manner" as Judge Gontrum described

it, undoubtedly played a part in the refusal of the Eurice brothers to build the Ray house, although they testified that the excess cost would be only about $1,000. More decisive, in all probability, was Mr. Ray's precision and his insistence on absolute accuracy in the smallest details which certainly made the Eurices unhappy, and to them was the shadow cast by harassing and expensive events to come. For example, at the meeting where the specifications were thrown across the desk, Mr. Ray agreed that certain millwork and trim which the Eurices had on hand was the equal of the specified Morgan millwork. Mr. Henry Eurice testified as to this:

> "He said that he thought ours were better. I said 'if we put that in your house how will we determine it was right or not?' He said he would bring a camera and take a picture of the moldings in our shed and when they were constructed in the house take another picture, and see if it would correspond. I said, 'Man, we can't build you a house under those conditions. It is not reasonable.' It created a heated argument for a while."

After written notice by Mr. Ray's lawyer to the lawyer for Eurice Corporation, that Mr. and Mrs. Ray considered that the contract had been breached and unless recognized within the week they would hold the Eurice Corporation "for any additional amount necessary to construct the house over and above the price called for in the agreement which has been breached by your client" had been ignored, suit was filed.

Mr. John Eurice agrees, in his testimony, that the Memorandum Sheets 1 to 7, dated January 9, had been gone over by him with Mr. and Mrs. Ray, but only as he says, to pick up "pointers". He also agrees that he had been told that the contract was to be drawn by Mr. Ray's lawyer, but says that he agreed only "so long as it is drawn up to our three page contract". He says that no specifications were attached to the contract which was signed, at the time it was signed, and Mr.

and Mrs. Ray cannot say definitely that the specifications were physically attached, although both say that they were unquestionably in existence and Mr. Ray is unequivocal and positive in his statement that they were present, stapled together, and discussed at the time of signing the contract. Mr. John Eurice says that the first time he saw the specifications was when his brother Henry "chucked them out", and in response to a question as to where they came from, said: "They were laying on the desk on the opened mail". This, he says, was some two weeks after the signing of the contract. No effort has been made by the appellee to show how the specifications arrived in the office at this time, with the opened mail. No envelope, with what could be a significant postmark, was introduced. No stenographer or clerk was brought into court to say that the specifications had been received in the mail, or to say that they had been delivered by messenger, or by Mr. Ray. Mr. John Eurice does not deny that he signed the plans and specifications, as well as the back of the contract at the office of the Loyola Building and Loan Association, but dismisses this as a practice necessary in all cases where financing is to be obtained, which has no relation to or significance in connection with the actual agreement between builder and owner.

Mr. Henry Eurice says that, although he was present at the time the contract was signed, and signed as a witness, that no specifications were attached to either copy of the signed contract, and that he did not see Specifications 1 to 5 until "right smart later, maybe a month." When he did first see them "they were laying on the desk on the opened mail".

Mr. John Eurice says in his testimony that the contract which was signed February 22 was not the proposal the Eurice Corporation had made. He sets forth that he read the contract of February 22 before he signed it, and he admits that he read paragraph B, whereby the builder agreed to construct the building strictly in accordance with the plans and specifications identified

by description and date. He says he thought that the specifications, although they referred to pages 1 through 5, were those in his proposal which covered only three pages. Mr. Henry Eurice says that he read the contract of February 22, and that he read the paragraph with respect to the plans and specifications, but that he, too, thought it referred to the three-page proposal. Both agree that the plans were present at the time of the signing of the contract.

On the basis of the testimony which has been cited at some length, Judge Gontrum found the following:

"The plaintiff, Mr. Ray, is an aeronautical engineer, a highly technical, precise gentleman, who has a truly remarkable memory for figures and dates and a meticulous regard for detail. Apparently, his profession and his training have schooled him to approach all problems in an exceedingly technical and probably very efficient manner. He testified with an exceptional fluency and plausibility. His mastery of language and recollection of dates and figures are phenomenal.

"The defendants in the case are what might be termed old fashioned country or community builders. Their work is technical but it doesn't call for the specialized ability that Mr. Ray's work demands. They conduct their business in a more easy going, hatchet and saw manner, and have apparently been successful in a small way in their field of home construction.

"The contract in question was entered into, in my judgment, in a hasty and rather careless fashion."

Judge Gontrum then cites the testimony of the Eurice Brothers that they had not seen Specifications 1 through 5 when they signed, and then says:

"* * * There is real doubt in my mind about the matter. Why the defendants signed the agrement without checking up on the specifica-

tions, I do not know, but they clearly were under the impression that the specifications referred to in the agreement were the specifications they had submitted some time prior and which they had permitted to be redrafted by the attorney for Mr. Ray. They both stated with absolute emphasis, and I do not question their veracity, that they were under the impression that the specifications in the agreement were the same which they had prepared."

He concludes by saying that he feels that Mr. and Mrs. Ray were under one impression, and that the Messrs. Eurice were under another impression, saying:

"* * * In my opinion there was an honest mistake; that there was no real meeting of the minds and that the plaintiffs and defendants had different sets of specifications in mind when this agreement was signed. The minds of the parties, so different in their approach, to use a mechanical phrase, did not mesh."

It is unnecessary to decide, as we see it, whether there was or was not a mistake on the part of the Eurice Corporation. It does strain credulity to hear that the Messrs. Eurice, builders all their adult lives and, on their own, successful builders for fifteen years of some twenty houses a year, would sign a simple contract to build a house, after they had read it, without knowing exactly what obligations they were assuming as to specifications requirements. The contract clearly referred to the specifications by designation, by number of pages and by date. It permits, in terms, no deviations from the specified makes or brands to be incorporated in the house, without the express permission of the owner. This would have been unimportant if the Eurice three-page specifications had been intended, since generality and not particularity was the emphasis there. Again, the contract could scarcely have intended to incorporate by reference the specifications in the three-page proposal because they were not set forth in a separate

writing, but were an integral part of a proposed contract, which itself was undated, and which was of *three* pages, while the specifications designated in the contract were dated and were stated to be in the contract, *five* pages. Further, it is undisputed that the five pages of February 14th were the seven pages of January 9th, corrected to reflect the deletions and changes made and agreed to by Mr. Ray and Mr. John Eurice. The crowning challenge to credulity in finding mistake is the fact that admittedly the contract, the plans and the specifications were all signed at one sitting by the President of the Eurice Corporation at the Loyola Building Association, after they had been signed by Mr. and Mrs. Ray.

If we assume the view as to mistake held by Judge Gontrum, in effect the mistake in the written agreement which prevented its execution by the Eurice Corporation from making it a contract was an unilateral one. It consisted, in the opinion of the Court, in the Eurice Corporation thinking it was assenting to its own specifications, while in form it was assenting to the Ray specifications. If there was such a mistake, the legal result the Court found to follow, we think does not follow.

The law is clear, absent fraud, duress or mutual mistake, that one having the capacity to understand a written document who reads and signs it, or, without reading it or having it read to him, signs it, is bound by his signature in law, at least. An integrated agreement may not be varied by parol where there is no mutual mistake, nor may the parties place their own interpretation on its meaning or intended meaning.

Neither fraud nor duress are in the case. If there was mistake it was unilateral. The Rays intended their specifications to be a part of the contract, and the contract so stated, so the misconception, if it existed, was in the minds of the Messrs. Eurice.

*Williston-Contracts* (Rev. Ed.), Sec. 1577—says as to unilateral mistake:

"But if a man acts negligently, and in such a way as to justify others in supposing that the

terms of the writing are assented to by him and the writing is accepted on that supposition, he will be bound both at law and in equity. Accordingly, even if an illiterate executes a deed under a mistake as to its contents, he is bound if he did not require it to be read to him or its object explained."

In Maryland there may be exceptions in proceedings for specific performance, but otherwise the rule is in accord. *Kappelman v. Bowie,* 201 Md. 86, 93 A. 2d 266. *Gross v. Stone,* 173 Md. 653, 664, 197 A. 137. *Spitze v. B. & O. R. R. Co.,* 75 Md. 162, 23 A. 307, and *McGrath v. Petersen,* 127 Md. 412, 96 A. 551. See also the *Restatement—Contracts,* Section 70, where it is said:

"One who makes a written offer which is accepted, or who manifests acceptance of the terms of a writing which he should reasonably understand to be an offer or proposed contract, is bound by the contract, though ignorant of the terms of the writing or of its proper interpretation."

It does not lie in the mouth of the appellee, then, to say that it intended to be bound to build only according to its specifications. First, its claimed intent is immaterial, where it has agreed in writing to a clearly expressed and unambiguous intent to the contrary. Next, it may not vary that clearly expressed written intent by parol. And, finally, it may not put its own interpretation on the meaning of the written agreement it has executed. The *Restatement-Contracts,* Section 20, states the first proposition:

"A manifestation of mutual assent by the parties to an informal contract is essential to its formation and the acts by which such assent is manifested, must be done with the intent to do those acts, but * * * neither mental assent to the promises in the contract nor real or apparent intent that the promises shall be legally binding, is essential."

*Williston* (work cited), Sec. 21, states the rule as follows: "The only intent of the parties to a contract which is essential, is an intent to say the words and do the acts which constitute their manifestation of assent." Judge Learned Hand expressed it in this wise: "A contract has, strictly speaking, nothing to do with the personal or individual intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort." *Hotchkiss v. National City Bank,* 200 Fed. 287, 293.

Next, if a contract has been integrated, it may not be varied by parol in the absence of mutual mistake, nor will it be rescinded or redrafted by the Court if one of the parties finds that he has made a bad deal or has become dissatisfied with its provisions. *Vincent v. Palmer,* 179 Md. 365, 19 A. 2d 183; *McKeever v. Realty Corp.,* 183 Md. 216, 37 A. 2d 305, and *Markoff v. Kreiner,* 180 Md. 150, 23 A. 2d 19.

Finally, where there has been an integration of an agreement, those who executed it will not be allowed to place their own interpretation on what it means or was intended to mean. The test in such case is objective and not subjective. *Restatement-Contracts,* Sec. 230. *McKeever v. Realty Corp., supra,* at page 220 of 183 Md. at page 308 of 37 A. 2d. *Williston* (work cited), Sec. 94, page 294, says: "It follows that the test of a true interpretation of an offer or acceptance is not what the party making it thought it meant or intended it to mean, but what a reasonable person in the position of the parties would have thought it meant". See also *Weil v. Free State Oil Co. of Maryland,* 200 Md. 62, 70, 87 A. 2d 826 at 829.

The lower court seemingly attached significance to the fact that the plans and specifications were not physically fastened to the contract document which was executed, although it specifically and explicitly referred to both. In this situation physical attachment has not the significance so attributed to it. It is settled that where a writing refers to another document that other document, or so much of it as is referred to, is to be interpreted as part of the writing. *Williston* (work cited), Sec. 628, page 1801. The *Restatement-Contracts*, Sec. 235 (c) and 208. *Gaybis v. Palm,* 201 Md. 78, 93 A. 2d 269. *Duplex Envelope Co. v. Balto. Post Co.,* 163 Md. 596. *Noel Construction Co. v. Atlas Cement Co.,* 103 Md. 209, 63 A. 384. *Ahern v. White,* 39 Md. 409. *Connor v. Manchester Assurance Co.,* 9 Cir., 130 Fed. 743, 70 L. R. A. 106. In *New England Iron Co. v. Culbert,* 91 N. Y. 153, the contract required that the work to be done should conform "in all particulars to the plans and specifications approved by (E. H. T.) and (H. A. S.) a copy of which specifications is declared to be annexed to and to form a part of the contract." In answer to the argument that the specifications had not been attached and so had no force, the Court said: "The annexation of the copy (of the) specifications was not a condition on which the validity of the agreement depended. If annexed the identification might have been more satisfactory, but without that, the contents of the plans and specifications, so far as referred to in the agreement executed, became constructively a part of it, and in that respect made one instrument". *Aetna Indemnity Co. v. Waters,* 110 Md. 673, 73 A. 712. See also *Valley Construction v. City of Calistoga,* 72 Calif. 2d 839, 165 Pac. 2d 521 and *North Bergen Board of Education v. Jaeger,* 67 N. J. L. 39, 50 A. 583, and 17 C. J. S., Contracts sec. 327, page 772.

We conclude that the appellee wrongfully breached its contract to build the plaintiffs a house for $16,300.00. The measure of damage in such a case presents no difficulty. *Keystone Engineering Corp. v. Sutter,* 196 Md.

620, 628, 78 A. 2d 191, 195.   Here Judge Marbury said for the Court:  "When a contractor on a building contract fails to perform, one of the remedies of the owner is to complete the contract, and charge the cost against the wrong-doer.   *Williston on Contracts* (Rev. Ed.) Vol. 5, Sec. 1363, p. 3823.   The *Restatement of Contracts*, Ch. 12, Par. 346, subsec. (1) (a) (i) p. 573 and Comment 1, p. 576."   See also, *Carrig v. Gilbert-Varker Corp.*, 314 Mass. 351, 50 N. E. 2d 59, 62, 147 A. L. R. 927. There the court said:  "The owner was entitled to be put in the same position that he would have been in if the contractor had performed its contract. * * * We think the proper measure of damages was the cost in excess of the contract price that would be incurred by the owner in having the houses built * * *".   That figure is ascertainable with sufficient definiteness in the instant case.   At the time he originally contemplated building, Mr. Ray had obtained bids from firms other than the appellee.   One was $14,000.00—a tentative and, it was believed an untrustworthy bid.   One was from J. Allen Thompson for $22,500.00, another from J. Raymond Gerwig Co. for $23,900.00, and another from the Eastern Contracting Co. for $24,800.00.   At the trial, the appellant produced Mr. Nelson Turner of the Eastern Contracting Co., who testified that on the market at that time, his bid of $24,800.00 would be a fair and reasonable price for the erection of the house called for in the plans and specifications in the Eurice contract.   Mr. Lewis L. Tignor, a builder, testified that he then would build the same house for $25,000.00.   Mr. J. Raymond Gerwig did not appear at the trial but Mr. Ray testified that he had submitted a current bid of $23,925.00.   The appellant also produced Mr. John W. Sands (whose qualifications were admitted by the appellee) to testify as an expert in the construction of houses and the cost of building them.   He testified that his calculations showed that the house in question could be built for $23,851.00 and that if he were invited to bid, he would submit a bid of that amount.

He testified further that the current market value of performance of the contract here involved would be within seven and one half per cent of $23,851.00, either way. The appellee argued strongly below—although it filed no brief and made no argument here—that damages had not been proved with sufficient definiteness. We think the proof on this point convincing. The appellee also argued below that the low bid of J. Raymond Gerwig should not be accepted because he had not been produced for cross examination. We are not impressed with this contention. Nevertheless, since Mr. Sands, the expert who testified for the appellants and whose qualifications were admitted by the appellee, placed the low figure for current market value of performance of the contract at $23,851.00 less seven and one-half per cent or $22,062.25, we will accept that amount for use in measuring damages, and award the appellants the difference between it and $16,300 or $5,762.25. They are entitled in addition to the expenses incurred by them in seeking the construction loan from the Loyola Federal Savings and Loan Association in the amount of $231.15.

*Judgment reversed with costs and judgment entered for appellants against appellee in the sum of $5,993.40.*