The **UNITED STATES of America for the Use and Benefit of CLARK–FONTANA PAINT COMPANY, Inc., Plaintiff,**

v.

**GLASSMAN CONSTRUCTION COMPANY, Inc., Home Indemnity Company, and Elmore Decorators, Inc., Defendants.**

**Civ. A. No. 16929.**

United States District Court
D. Maryland.

March 31, 1967.

Joseph F. Vallario, Jr., Hyattsville, Md., for plaintiff.

Leonard S. Melrod and Melrod, Redman & Gartlan, Washington, D. C., for defendants.

HARVEY, District Judge:

This suit under the Miller Act was brought by a supplier of materials (Clark-Fontana) against a subcontractor (Elmore), the general contractor (Glassman), and the latter's surety.[1] Glassman entered into a written contract with the United States on June 26, 1964 for the construction of 150 housing units at Andrews Air Force Base, Maryland. Glassman, as principal, and Home Indemnity Company, as surety, executed a payment bond in the form required by the Miller Act,[2] conditioned upon the prompt payment of all persons supplying labor and materials for the job.

Glassman entered into a written subcontract on August 24, 1964 with Elmore,[3] whereby Elmore undertook to perform the painting work required under the principal contract for $56,500. Clark-Fontana in turn agreed with Elmore to supply the paint needed for the project. To assure itself of payment by the subcontractor, Clark-Fontana requested that Glassman agree to make payments on the Elmore subcontract by means of checks payable jointly to Elmore and Clark-Fontana. A written agreement called a "Joint Check Assignment" dated January 14, 1965 was signed by Glassman and Elmore whereby Glassman agreed to "make all payments for above listed job by joint check drawn Elmore Decorating Co. Inc. and Clark Fontana Paint Company" (*sic*).

Thereafter, Elmore's men started their work at the job site, and Clark-Fontana delivered paint, billing Elmore for the cost thereof. Pursuant to the terms of the Joint Check Assignment, Glassman drew and delivered to Elmore nine checks payable to "Elmore Decorators and Clark-Fontana Paint Company". These nine checks totalled $30,300 and bore dates from March 15, 1965 to July 15, 1965. On the reverse side of each check, the following legend was stamped in capital letters:

"THE UNDERSIGNED ENDORSER(S), IN CONSIDERATION OF THE ISSUANCE OF THIS CHECK, DO HEREBY WAIVE AND RELEASE TO THE EXTENT OF THE FULL FACE VALUE HEREOF ANY RIGHT ANY OF THEM MAY HAVE TO CLAIM A MECHANIC'S OR MATERIALMEN'S LIEN OR TO ASSERT ANY CLAIM UNDER ANY BOND GIVEN BY THE PAYER HEREOF AS PRINCIPAL, FOR ANY WORK DONE FOR OR MATERIALS FURNISHED TO THE PAYER HEREOF OR ANY OTHER PAYEE OR PAYEES NAMED HEREIN IN OR ABOUT THE CONSTRUCTION, REPAIR OR IMPROVEMENT OF THE JOB DESIGNATED ON THE REVERSE SIDE HEREOF."

On the reverse side of all but one of the checks there was also stamped "NOTE: TWO ENDORSEMENTS REQUIRED."

---

1. Elmore was named as a defendant in the original complaint. However, since bankruptcy proceedings were pending against Elmore when the suit was commenced, no answer was ever filed on its behalf, and this action was not pressed against Elmore.

2. 40 U.S.C.A. §§ 270a and 270b.

3. A sole proprietorship when the subcontract was executed, Elmore later was incorporated.

John L. Eubank, President of Elmore, would receive these checks from Glassman, indorse them and take them personally to Clark-Fontana's President for indorsement. Seven of the checks, after indorsement by both payees, were deposited in Elmore's account at Citizen's National Bank. Two of the checks were deposited, after indorsement, in Clark-Fontana's account at Riggs National Bank. From time to time during the period that these checks were being received, Eubank would deliver Elmore's own check to Clark-Fontana, to be applied against the paint account. On the two occasions that Clark-Fontana deposited checks in its bank account, Clark-Fontana gave Elmore its checks to be used for Elmore's payroll account.

As the work progressed, Elmore experienced increasing difficulty in meeting its payroll. When Glassman declined to make further advances beyond the requirements of the subcontract, Elmore, which was without capital or borrowing power, signed at Glassman's request a letter dated July 22, 1965 giving notice of default. Glassman thereupon undertook to complete the painting work by employing Elmore's painters, and from July 22 until August 8, 1965, such painters were paid directly by Glassman. Meanwhile, Clark-Fontana, unaware of Elmore's default, continued to deliver paint to the job site. On August 9, 1965, a voluntary petition in bankruptcy was filed in this Court by Elmore, notice of which was received by Clark-Fontana the same day.

By the time of the bankruptcy, Clark-Fontana had furnished a total of $20,707.74 in paint materials for the project and had been paid therefor $7,817.16. Clark-Fontana sues here for the difference amounting to $12,890.58, plus interest, and in addition claims $1,485.20, plus interest, for materials delivered directly to Glassman after August 9, 1965.

Although defendants originally contested the entire $14,375.78 claimed in this suit, they have now conceded, after trial, that $5,124.23 is due under the contract, being $3,639.03 in materials delivered between July 15, 1965 and August 9, 1965 and $1,485.20 delivered after August 9, 1965. Relying on Clark-Fontana's indorsements of the nine Glassman checks, defendants deny liability for the remaining $9,251.55 on grounds of (1) waiver, (2) estoppel, and (3) payment. Clark-Fontana in turn emphasizes the remedial nature of the Miller Act and denies that its indorsements beneath the printed language on each check amount to a waiver of any rights under the Act.

■ It is well established that the Miller Act is remedial in character and should be liberally construed in support of its purpose to protect subcontractors and materialmen furnishing labor or materials for government projects. MacEvoy Co. v. United States, 322 U.S. 102, 104, 64 S.Ct. 890, 88 L.Ed. 1163 (1944); Noland Company v. Allied Contractors, Incorporated, 273 F.2d 917, 921 (4th Cir. 1960); United States v. Endebrock-White Company, Inc., 275 F.2d 57, 70 (4th Cir. 1960). On the other hand, the Act poses problems for the general contractor which has in fact paid a subcontractor for materials and labor furnished for a building project but which may have to pay twice if because of insolvency or other reasons the subcontractor has failed to pay the supplier of materials its proper share. To avoid having to pay twice for materials incorporated into a project, general contractors often resort to the practice (apparently common in the industry) of making checks jointly payable to the subcontractor and materialman involved. The question raised by this case is whether a supplier of materials who has not in fact been fully paid can recover under the Miller Act the balance due, when it has received and indorsed checks from the general contractor which were more than sufficient to cover such balance.

The evidence in the case at hand indicates that Clark-Fontana itself requested the joint check agreement so that it could be assured of payment. Reginald R. Clark, the President of Clark-Fontana, testified that he knew that Elmore was

under-financed and was having difficulty in meeting its payroll as the job progressed. He also testified that he knew that arrangements for payment by joint checks were made in many cases "especially in Maryland" to protect the general contractor from having to pay twice because of the requirements of the mechanics lien law or the Miller Act. When asked whether he had read the stamped legend on the reverse side of each check adding the indorsement, Clark testified that he had read the first part but thinking that it merely stated that two indorsements were required, he did not read the language in its entirety.

█ Under such circumstances, Clark-Fontana must be bound by the terms of the waiver set forth on the reverse side of each check, immediately above its indorsement. One who signs a document is presumed in law to have read and understood its contents, and if he signs without reading it, he acts at his peril, absent fraud, duress or mutual mistake. The Henry S. Grove, 22 F.2d 444 (D.Md. 1927); Ray v. William E. Eurice and Bros., Inc., 201 Md. 115, 93 A.2d 272 (1952). Nine separate times Clark-Fontana's indorsement was placed on the back of these checks. Clark-Fontana's contention that it did not know that it was giving up its rights under the Miller Act by indorsing these checks must be rejected under the evidence here present, particularly in view of the testimony of its President that he knew that one of the purposes of a joint check agreement was to protect the general contractor from having to pay twice.

█ Plaintiff argues that the language stamped on the reverse side of each check did not clearly spell out the extent of any waiver involved. A notation placed on a negotiable instrument must, of course, have a meaning which can be understood if it is to form the basis for a valid defense to a suit. Marden v. Jones, 165 Md. 450, 169 A. 309 (1933); 17 M.L.E. Negotiable Instruments § 97.

Under the notation on each of these checks, the indorsers purport to "waive and release to the extent of the full face value hereof, any right any of them may have" to assert a claim under any bond given by the payer as principal for work done or materials furnished for this construction job. Manifestly, this language cannot mean that each of the two indorsers waives its right to claim an amount equal to the face amount of the check. Under such a construction, a general contractor could discharge $2,000 worth of indebtedness by the mere issuance of a $1,000 check. Defendants do not press this construction.

█ What this language does mean is that the subcontractor and the supplier of materials jointly surrender their right to claim under the Miller Act the amount paid to them together. A materialman who has not been paid has the right under the Miller Act to make claim against the general contractor and its surety for amounts legally due and owing for materials used in the project.[4] The language in question obviously means that such existent right is being surrendered to the extent of the amount paid by the check, with each individual party waiving the amount that it actually received. To protect itself, a prudent materialman faced with a notation similar to that involved here should arrange before indorsing to receive from the proceeds of the check the amount owed by the subcontractor as of the date of such check. Such protection is fully afforded if the materialman will either (1) refuse to indorse the check unless the subcontractor pays the outstanding account, or (2) deposit the check after indorsement in its own account and remit to the subcontractor a check for any excess over the amount presently due.

█ In any event, if the legend on the reverse side of each of these checks is considered in the light of the facts present in this case, there can be little doubt that its meaning is sufficiently clear to be the basis for a valid defense

---

4. No contention has been made in this case that notice was not timely given or that suit was not timely filed pursuant to provisions of the Act.

to the portion of Clark-Fontana's claim still at issue. In the present case, Clark-Fontana knew that Elmore was under-financed and was having difficulty meeting its payroll. It further knew that Glassman was paying by joint check to avoid having to pay twice if because of Elmore's default Clark-Fontana sued under the Miller Act. In spite of this knowledge, Clark-Fontana unaccountably indorsed checks and turned over the bulk of the proceeds to Elmore at times when it was owed substantial amounts for materials already delivered to the job site. On two occasions, it even deposited checks in its bank account, and returned portions to Elmore in spite of a large balance due from Elmore.[5] Clark-Fontana's explanation for turning funds over to Elmore despite amounts owed for materials already delivered was that it assumed that there was enough money due under the contract to meet the paint payments. In making such assumption, Clark-Fontana must accept the obvious risk inherent therein, namely, that because of Elmore's insolvency it might never be paid. The Miller Act was not intended to protect against losses caused by poor business judgment.

The evidence indicates that had Clark-Fontana, after indorsement, retained only that portion of each joint check that represented the balance due it as of the date of such check, it would have received $17,068.71 as of July 15, 1965, the date of the last joint check. A statement of the account is as follows:

| Date of Joint Check | Amount of Joint Check | Invoices Between Joint Check Dates | Total Invoice Amount Due | Amount of Joint Check which should have been withheld by Clark-Fontana to satisfy balance |
|---|---|---|---|---|
| 3–15–65 | $ 1,800.00 | $ 4,164.06 | $4,164.06 | $ 1,800.00 |
| 4–23–65 | 5,400.00 | 605.10 | 2,969.16 | 2,969.16 |
| 5–6–65 | 4,500.00 | 751.57 | 751.57 | 751.57 |
| 5–21–65 | 3,000.00 | 1,317.20 | 1,317.20 | 1,317.20 |
| 6–4–65 | 4,000.00 | 877.74 | 877.74 | 877.74 |
| 6–25–65 | 2,000.00 | 5,545.78 | 5,545.78 | 2,000.00 |
| 7–2–65 | 3,400.00 | 2,168.94 | 5,714.72 | 3,400.00 |
| 7–9–65 | 3,100.00 | 273.47 | 2,588.19 | 2,588.19 |
| 7–15–65 | 3,100.00 | 1,364.85 | 1,364.85 | 1,364.85 |
| | $30,300.00 | $17,068.71 | | $17.068.71 |

During this period Clark-Fontana in fact received from Elmore or retained from the proceeds of the joint checks a total of $7,817.16. Whatever its reasons might have been for not collecting the full amount due when at various times it had in hand payments from Glassman sufficient to cover all outstanding invoices, Clark-Fontana expressly waived its right to recover the balance of $9,251.55 under the Miller Act when it indorsed Glassman's checks bearing the stamped legend in question.[6]

5. In view of the Court's decision as to the defense of waiver, it is not necessary to determine whether the defense of payment also applies as to these two checks.

6. In view of the finding herein of an express waiver, it is not necessary to consider whether the same facts would bar recovery under a theory of estoppel.

United States for the Use of Koppers Co., Inc., v. Five Boro Construction Corporation, 310 F.2d 701 (4th Cir. 1962) is not to the contrary. In that case, as here, the prime contractor had at the request of the supplier agreed to issue checks payable jointly to the subcontractor and the supplier. The court held that an agreement to pay by joint checks in and of itself would not constitute a waiver of rights under the Miller Act. The facts in that case did not indicate that any joint checks had ever in fact been issued and received by the supplier. The court noted that conceivably the supplier "may waive his rights" under the Act but found nothing in the case to show any waiver or intention to waive by the supplier.

Clark-Fontana further argues that Glassman breached the joint check agreement by failing to issue joint checks after Elmore's letter of default of July 22, 1965 and, therefore, should be required to pay the balance due on the account. Clark-Fontana contends that as a third party beneficiary of such contract, it is entitled to enforce a promise made for its benefit even after a breach by one of the original parties.

■■ This argument must be rejected for two reasons. First, since Glassman is not now contesting Clark-Fontana's right to recover all sums due for deliveries made *after* July 15, 1965, its failure to make payments by joint checks after that date is not prejudicial to Clark-Fontana. Secondly, a third party beneficiary can acquire no greater rights against a promisor than the promisee had and cannot enforce an agreement of the promisor made for the benefit of the third party beneficiary if the promisee fails to perform its part of the bargain. Restatement, Contracts, § 140; Williston on Contracts, (3rd Ed.), § 395; Williams v. Paxson Coal Co., 346 Pa. 468, 31 A.2d 69 (1943). The facts of the present

case indicate that the breach here was that of Elmore which could not continue to meet its obligations under the subcontract because of financial difficulties. Any rights acquired by Clark-Fontana as a third party beneficiary of the joint check agreement did not survive Elmore's failure to perform its part of the bargain.

For the reasons stated, judgment will be entered in favor of the plaintiff for $5,124.23, plus interest at 6%, and costs. Counsel will prepare and submit an appropriate order providing for the date or dates for the commencement of interest.