# ANNE ARUNDEL COUNTY, MARYLAND
## v. CUSHMAN

[No. 383, September Term, 1968.]

*Decided October 9, 1969.*

The cause was argued before HAMMOND, C. J., and

154

MARBURY, BARNES, MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*John B. Court, Assistant County Solicitor,* with whom was *Phillip F. Scheibe, County Solicitor,* on the brief, for the appellant.

*William J. Boehm* for appellee.

SINGLEY, J., delivered the opinion of the Court.

Anne Arundel County (the County) appeals from an order of the Circuit Court for Anne Arundel County which had the effect of reforming the supplements to a contract for the collection of refuse which Cushman had entered into with the County and specifically enforcing the supplements as reformed. The controversy was before us in *Cushman v. Anne Arundel County,* 246 Md. 525, 228 A. 2d 825 (1967) where we remanded the case to the Circuit Court for Anne Arundel County for further proceedings because the lower court had dismissed Cushman's complaint on the pleadings without taking testimony. We treated the dismissal as a summary judgment which had been improvidently entered in a case where there was a dispute as to material facts. *Waldman v. Rohrbaugh,* 241 Md. 137, 139, 215 A. 2d 825 (1966). On remand, Cushman amended his bill of complaint, and sought reformation of his supplemental contracts as an alternative to specific performance.

The factual background of the dispute is set out in detail in our opinion filed in *Cushman v. Anne Arundel County, supra,* 246 Md. at 527-31, and need only be summarized here. In 1959, the County asked for lump sum bids for the collection of refuse in certain areas of the third and fifth election districts of the County for the calendar year 1960. The specifications called for a contract which would be automatically renewable for four successive calendar years on the same terms and conditions, subject, however, to termination by either party at

the end of any calendar year on four months' written notice.

Cushman's bid of $53,328 for the collection of refuse in zone 7, which lay partly in the third and partly in the fifth district, was the low bid and he was awarded a contract for the year 1960. The contract contained a further provision which is of some significance here:

> "* * * Right to renegotiate this contract shall be reserved to either of the parties hereto upon written request delivered to the place of business of the other party not later than four (4) months prior to the end of any calendar year for the purpose of adjusting the compensation hereunder for the number of properties served in existing zones, or to include new areas to be served in such zones. *Such adjustment shall be at the same rate per collection unit as applies under this contract.* The contract for each renewal period shall be executed and performance bond furnished not less than thirty (30) days prior to the beginning of each annual period." (emphasis added).

The argument which arose related to ten supplements to the contract, respectively entered into between Cushman and the County on 19 February 1960 (retroactive to 1 January 1960);[1] 1 July 1960 (effective on that date); 16 February 1961 (retroactive to 1 January 1961); 1 July 1961 (effective 1 July 1961); 26 February 1962 (retroactive to 1 January 1962); 1 July 1962 (effective 1 July 1962); 18 February 1963 (retroactive to 1 January 1963); 9 July 1963 (retroactive to 1 July 1963); 21 February 1964 (retroactive to 1 January 1964); 22 July 1964 (retroactive to 1 July 1964), each of which added new collection units, for which Cushman was to

---

1. It is important to note that the first supplement was made less than two months after the contract became effective and that thereafter the contract was supplemented at intervals of about six months. Both parties seem to have ignored the provision for an annual renegotiation on four months' notice.

be compensated, as specified by the supplement, at an annual rate of $13.65 per additional unit.

The nub of the controversy lies in the computation of the unit price. Simply stated, the County contended that zone 7 contained 3908 collection units on 1 January 1960; Cushman, that zone 7 contained 2932 units. However, as will be pointed out, it was not until late in 1964 that the number of units was precisely ascertained. When the number of units which the County believed to be in zone 7 was divided into the lump sum contract price in ostensible compliance with the formula set out in the contract provision quoted above, the County came up with a unit price of $13.65; and Cushman, based on his calculations, with a unit price of $18.11.

During the period 1 January 1960 to 31 December 1964, 1288 collection units were added to zone 7 by the contract supplements, each at the County's unit price of $13.65. If Cushman's calculation of a unit price of $18.11 can be sustained, the County owes Cushman the additional sum of $19,809, which was the amount entered by the order from which the County has appealed.

The County assigns four reasons why the order should be reversed:

i. The lower court "misunderstood" and "misstated" a stipulation as to the original collection unit count.

ii. Cushman's oral complaints were insufficient "to be heard in derogation of the explicit substantive terms of the contract."

iii. Cushman "was estopped to complain by his prolonged foreknowledge in the premises" and waived "any right of reformation by his prolonged acquiescence."

iv. The weight of Cushman's evidence was "rendered questionable by an improper leading, direct examination of a friendly witness."

i.

The stipulation to which the County refers developed in a colloquy between counsel and the lower court. Rather than attempt to analyze the effect of the exchange, we

shall assume for purposes of this opinion that the County's contention is well taken. Entirely apart from the stipulation, however, there was ample evidence from which the chancellor could have found the facts on which he relied: first, that in 1960, the County assumed that there were 3908 collection units in zone 7; second, that 1288 units were added between 1960 and 1964; and third, that by actual field count in November, 1964, there were found to be 4220 units in the zone. It requires no mathematical wizardry to divine that there must have been 2932 units in zone 7 in 1960, before 1288 units were added. It seems to be conceded by both sides that it was not the County's practice to take into account "abate-. ments": *i.e.*, the deletion of collection pick-ups from the route, because of vacancy or other reasons.

### ii. and iii.

The thrust of these two contentions, as we understand them, is that the parol evidence rule prevents a written agreement from being contradicted, added to or varied by parol, except where there is a mutual mistake of fact, and that Cushman's familiarity with zone 7 renders the mistake, assuming that there was a mistake, a unilateral mistake, which will not support reformation absent the element of fraud or duress. *Glass v. Doctors Hospital, Inc.*, 213 Md. 44, 131 A. 2d 254 (1957); *Ray v. Eurice*, 201 Md. 115, 93 A. 2d 272 (1952).

It seems to us that this bridge was crossed in the earlier case, where this Court, speaking through Chief Judge Hammond, said:

"* * * We think the County, having called for a lump sum contract which contemplated on the County's part either existing knowledge or prompt ascertainment of the number of existing units to be serviced, cannot say that it was misled by what Cushman alleges was temporary and tentative acquiescence in the County's estimate of the number of units or by his delay

in asserting a higher unit price." 246 Md. at
532.

To us, it seems quite significant that neither the contract nor the specifications referred to the number of collection units in zone 7, nor fixed a unit price. There was no evidence that Cushman had counted the units prior to sometime in 1964, when his field check tallied with the County's.

It is quite clear from the testimony that until 1964, when the County made a field count at Cushman's insistence, the County had no reliable figures on the number of collection units in zone 7. George Cureton, a witness for the County, testified that he was construction engineer in the County's Department of Public Works during the period in controversy. When asked where he got the information that there were 3908 collection units in zone 7, he said, "This is the figure that was left to me, I inherited that." He then explained that the figure had come from Mr. Joesting, his predecessor.

Cureton then described his discussion with Cushman:

"Q.25 Did he [Cushman] ever complain to you about the supplemental agreements that were being signed shortly after the original contract had been extended?

"A. The first letter went out—

"Q.26 What was his complaint?

"A. The first letter went out, like I say, the middle of January or thereabouts, and I don't know whether it was Mr. Dunn [the County Treasurer] or who he came down with, but we had a meeting in Mr. Pantaleo's [the Director of Public Works] office and at that time we told him, the only thing I told him was these were the only figures we had to work with, I mean, there was no other way that we could come up with another figure. This is what the man had left us to work with and we had to go

with it. And, it's been said before, if there was any change indicated that this would have to be taken care of sometime later."

Edward M. Dunn, Jr., who was County Treasurer in 1960 and 1961, and County Commissioner after 1961, called as a witness by Cushman, testified that Cushman had been "almost a weekly visitor" during this period, and that Cushman was told:

> "* * * It was a matter of routine, it had been done with the other contractors, we called a survey or census, we called it then, indicated the County owed [Cushman] money, he'd be paid, if it indicated he was being overpaid we might look for an adjustment from that standpoint."

Contrary to the County's contention that Cushman acquiesced, there was ample evidence that Cushman repeatedly questioned the accuracy of the County's figure of 3908 collection units, and urged that a count be made in the field.

Theodore Pantaleo, the County's Director of Public Works at the time, also testified for Cushman. He said that Cushman's visits to him were "numerous" and that they related to the unit count. The testimony continued:

"Q.22 In other words, Mr. Cushman was the last man to have his zone counted?

"A. If I remember, that's correct, yes.

"Q.23 Now, Mr. Pantaleo, did you ever discuss the facts with Mr. Cushman in regards to the survey, that when it was completed what position the County would take?

"A. Oh, I think I took the position that I certainly would recommend that some adjustment be made to compensate him for the difference.

"Q.24 Did you advise Mr. Cushman of this?

"A. I did.

"Q.25 And as a result he was pacified and he continued his services?

"A. That's correct."

The County's delay was attributable to a shortage of personnel, and Cushman was lulled into inactivity by the County's repeated assurances that a count would be made, and an adjustment of payments effected, either in Cushman's favor or against him, depending on the results of the count. This does not constitute laches under the cases. *Parker v. Bd. of Election Supervisors*, 230 Md. 126, 130, 131, 186 A. 2d 195 (1962). Nor do we believe that Cushman is estopped from obtaining relief. *Chesapeake Homes v. McGrath*, 249 Md. 480, 489, 240 A. 2d 245 (1968).

It should be emphasized that the mutual mistake found by the chancellor lay not in the original contract, but only in the 10 supplemental agreements, which had adopted a figure of $13.65 per unit, arrived at by dividing 3908 units, described by the County's own witness as an "inherited" figure, into the lump sum bid of $53,328 and rounded off the resulting figure of $13.6458.

As we see it, this is almost the classic example of a permissible correction of a written instrument by a court of equity to express the true intention of the parties, when the true intention has not been stated because of a mutual mistake. *Mattingly v. Houston*, 235 Md. 54, 200 A. 2d 160 (1964); *Painter v. Delea Att'y*, 229 Md. 558, 184 A. 2d 913 (1962); *Hoffman v. Chapman*, 182 Md. 208, 34 A. 2d 438 (1943); 4 Pomeroy, *Equity Jurisprudence* § 1376 (5th Ed. 1941).

iv.

The last point made by the County is that Edward M. Dunn, Jr., at the time of the trial an Anne Arundel County Councilman who had been called as a witness by Cushman, was asked 22 leading questions during his direct examination, which somehow caused a cloud to be cast on "the weight of Cushman's evidence." This contention can be readily disposed of. In the first place, the transcript clearly shows that before Dunn testified, the

chancellor ruled that Dunn was an adverse witness and that he could be asked leading questions. It is not clear that an exception was taken to this ruling, but even assuming that there was, no objection was made when any of the questions was asked. There is nothing for us to review. Maryland Rule 522; *Rose v. State,* 240 Md. 65, 212 A. 2d 742 (1965) ; *Gwaltney v. Morris,* 237 Md. 173, 205 A. 2d 266 (1964).

One final question remains. Cushman has moved that we strike the reply brief filed by the County, primarily because there is contained in the appendix the form of proposal and specifications released by the County for waste collection contracts put out for bids in November 1964. Cushman argues, and we think correctly, that the material was not in evidence below, is not part of the "original papers" as contemplated by Rules 826 b and c and cannot be included in the extract provided for by Rule 828. The County argues that the motion to strike comes too late, but cites no authority for this, and that Maryland Code (1957, 1965 Repl. Vol. 1968 Cum. Supp.) Art. 35, Sec. 66 A (the Act) requires us to take judicial notice of the material contained in the appendix.

Assuming, *arguendo,* that the County is entitled to rely on an Act, which by its terms took effect 1 July 1968, after the trial of the case below, the County's argument overlooks the fact that the Act provides that "[t]he public laws, ordinances, regulations, and resolutions approved and enacted by the respective counties * * * shall be judicially noticed or shall be read in evidence either from the printed volume thereof or from a true copy of an amendment thereto, published by the authority of said bodies." By no stretch of the imagination can the Act be construed to encompass notices to bidders, bidding requirements, specifications and a form of proposal proffered without any indication that they were adopted by resolution and published. The material was not offered in evidence below, formed no part of the transcript, and should not have been included in the printed

extract. It is obvious that Cushman's motion was made under Rule 855, which fixes no time limit, and not under Rule 836, which does. The appendix will be stricken.

*Order affirmed; costs to be paid by appellant.*