486 A.2d 212

## NATIONAL FIRE INSURANCE COMPANY OF HARTFORD

v.

## TONGUE, BROOKS & COMPANY, INC.

No. 289, Sept. Term, 1984.

Court of Special Appeals of Maryland.

Jan. 8, 1985.

218

Steven R. Buckner, Bethesda (Caplan, Wechsler, Selzer & Buckner, Bethesda, on brief), for appellant.

Howard G. Goldberg, Baltimore (Smith, Somerville & Case, Baltimore, on brief), for appellee.

Argued before ADKINS, ALPERT and ROSALYN B. BELL, JJ.

ADKINS, Judge.

On April 14, 1980, a restaurant known as Dino's Italian Cuisine was damaged by fire. Appellant National Fire Insurance Company of Hartford paid the loss. It then sued appellee Tongue, Brooks & Company, Inc. The gravamen of the action was that Tongue, Brooks had breached various contractual and fiduciary duties in connection with the issuance of a binder covering Dino's. After a lengthy trial, the lower court thought the issue before it was a narrow one—whether National Fire had sustained its burden of proving that no insurance policy was in force at the time of the fire. It found, in effect, that the evidence showed that the Dino's risk had been accepted by the insurer. It entered judgment for Tongue, Brooks. This appeal followed.

National Fire poses four issues on appeal:

1. Was a one-year binder issued by Tongue, Brooks on March 31, 1980, void *ab initio?*

2. Did Tongue, Brooks breach its fiduciary duty when it issued a restaurant risk binder without authority to do so?

3. Was the trial court clearly erroneous in finding that Tongue, Brooks reasonably believed the risk had been accepted by the insurer?

4. Was there a binding contract of insurance when the identity of the insurer and the premiums to be paid were not specified?

We think the third and fourth issues are dispositive of the appeal. We shall place them in their rather complex factual context, but first we shall identify some of the principal *dramatis personnae.*

One of the principal actors is *CNA Insurance Company.* It is an umbrella corporation covering (perhaps owning) eight "member" (or subsidiary) insurance companies, one of which is appellant *National Fire Insurance Company of Hartford* and another of which is *Continental Casualty Company.*

CNA executes agency agreements with insurance agencies. At the times relevant to this appeal, there was a preferred agency agreement between CNA and appellee, *Tongue, Brooks & Company, Inc.,* a Baltimore insurance agency. That agreement authorized Tongue, Brooks, among other things, to "bind, execute and issue" certain types of insurance contracts for several CNA companies, including National Fire and Continental Casualty.

To conduct its business, CNA employs a number of underwriters, who are authorized to accept or reject applications for coverage. Those involved in this case were *Gus Abato, Angela Bohne* and *Barbara Jackson.*[1] Tongue, Brooks also employs underwriters. These underwriters are responsible for finding insurance coverage for Tongue, Brooks's

---

**1.** After the events we shall recount, Barbara Jackson's name was changed by marriage to Barbara Lewis. For the sake of simplicity, we shall refer to her as Barbara Jackson; that is the way her name appears in the exhibits and much of the testimony.

clients. The one chiefly involved in this case was *Camille Morton.*

At the time critical to this case, *Dino's Italian Cuisine* was the trade name of a restaurant operated by Park Liquors, Inc. Its principals were *Alan Phillips,* a client of Tongue, Brooks's, and *Leo Helms.*

Keeping in mind this cast of characters, we review the pertinent facts.

On February 4, 1980, Alan Phillips telephoned Tongue, Brooks and asked it to act as his broker to obtain insurance for Dino's, a restaurant that he and Leo Helms were in the process of purchasing. The task of locating a carrier who would accept the risk was assigned to Camille Morton. She contacted CNA because CNA had a specialized program for restaurant risks and because Continental Casualty had written some prior coverage for Dino's and for Phillips.

Morton talked to CNA's Gus Abato. They discussed building, contents, general liability, combined bodily injury and property damage, and workers' compensation insurance. Abato wanted more information, especially financial information, about Dino's and its principals, but orally approved a thirty-day binder for the risks. Morton issued this binder on February 20. She also requested and on February 25 received Abato's approval for an increase in the dollar value covered.

On March 7 the original binder was about to expire. Morton again called Abato and requested a fifteen-day extension. She informed him that financial information was being gathered and a formal application for a restaurant package was being prepared. Abato granted the extension and Morton issued a new binder for the period March 7—March 23.

Shortly after the March 7 conversation, Abato left the employ of CNA. Barbara Jackson was assigned CNA's Tongue, Brooks account. On March 12 she received from Morton applications for a restaurant package and workers' compensation policies for Dino's.

By March 20, Morton had heard nothing further from CNA. She attempted to call Abato, but was referred to Jackson. She requested a further extension of the binder. Jackson, claiming lack of familiarity with the Dino's matter, said she would have to obtain the approval of her supervisor, Angela Bohne. When Morton called back on March 21, Jackson told her Bohne had approved an extension to March 28.

During the March 21 conversation, Jackson also told Morton that she had been unable to locate the Dino's applications. Apparently she had never attempted to do so. In any event, Morton forwarded duplicates.

The final telephone conversation between Morton and Jackson took place on March 27. The most recent binder was to expire the next day. Morton had heard nothing from CNA since March 21. She called Jackson to convey personal financial information about Leo Helms and to see if the requested coverage would be written. Jackson, it appears, had continued to do nothing about Dino's—she had neither attempted to locate the original applications nor had she reviewed the duplicates. During this conversation Jackson finally reviewed the applications. It appears she was satisfied on all counts except financial information. Morton read Helms's financial statement over the phone. According to Morton, Jackson said "everything looked in order" and "that CNA could write the risk" for one year effective February 5, 1980. Morton testified that Jackson approved the coverages.

Jackson remembered the conversation differently. Although conceding that she told Morton "it looks good" she testified she did not approve the issuance of the policy, but instead would have to have corporate (as opposed to personal) financial information before a final underwriting decision could be made. Since Phillips had just formed the company that had or was to purchase Dino's, there was no corporate financial information. Thus, none was ever sent or communicated over the phone.

In any case, after the March 27 conversation Morton recalled (although she was not sure) that she told John Brooks, her superior at Tongue, Brooks that Jackson had approved coverage on behalf of Continental Casualty. She terminated efforts to secure coverage from other insurers. And she issued a one-year binder on Dino's dating from February 5, 1980. Like the previous binders, this one showed Continental Casualty as the insurer. Unlike the earlier ones, no copy was sent to CNA.

Jackson testified that after the March 27 conversation, she never gave the matter another thought, even though she admitted receiving Helms's financial statement on March 31, and even though she must have been aware that Dino's last binder had expired on March 28. Despite her inattention to the matter, however, a workers' compensation policy for Dino's arrived at Tongue, Brooks on April 8. No other policy was ever received.[2]

On April 14, Dino's was damaged by fire. The next day representatives of CNA and Tongue, Brooks met. CNA contended no long term coverage was ever authorized by Jackson and that all the approved binders had expired before the fire. Tongue, Brooks argued that the coverage had been approved by Jackson on March 27 and that it was in force on April 14. Eventually, CNA's branch manager decided that "to protect CNA's name and reputation in the insurance industry" and because of concern about the doctrine of apparent authority, the Dino's loss would be paid. Although all the binders had been issued in the name of Continental Casualty, CNA caused a policy to issue from National Fire. National Fire collected premiums for two and one-half months, paid the Dino's loss of $203,014.88, and cancelled the policy. It then brought the instant suit. As we have seen, it lost.

---

**2.** That a fire policy had not been received by April 14, the date of the loss, is not significant. There was evidence that delivery of a policy sometimes does not occur until as long as a month or two after acceptance of the risk.

On appeal, National Fire expends much effort in asserting that the one-year binder issued by Morton was void *ab initio* as a matter of law. It also contends that Tongue, Brooks breached its fiduciary duty by unilaterally issuing a restaurant binder when, under the express terms of the Preferred Binding Authority Schedule between it and CNA, restaurant risks were excluded. Assuming, without deciding, that these arguments are correct, they are of little solace to National Fire if the trial judge was correct in his view of the case. As he saw it, if CNA, through its employee, Jackson, agreed to issue a policy on Dino's, the one-year binder was immaterial. The rights of the parties would be governed by that contract, not by the binder. He explained his decision thus:

> [T]he basic question remains as to whether there was coverage extended on this risk by CNA. There has been a lot of discussion about whether the binders are good for x number of days or anything else, and the fact that they are supposed to be in writing on both sides, the home office and the agency are doing a lot of things by word of mouth that they are not supposed to do. But I think the final law of the case ... is that [counsel for National Fire] agreed that while it may not have been exactly in accordance with all of the written policies, that if there was an oral message from the underwriter, to wit, Jackson, saying in essence we will write the policy, then the risk had been accepted....

After reviewing the evidence at length he turned to the telephone conversation of March 27 and found:

> Ms. Jackson may not think that she was saying that we have accepted the risk, but I think that Mrs. Morton as a reasonable person at the conclusion of that conversation was justified in believing that the risk had been accepted....

He concluded that National Fire, as plaintiff, had failed to meet its burden of proving that no policy was in force.

National Fire does not dispute the legal theory espoused by the trial judge. In view of the concessions it made at trial, it could hardly do so. But it does vigorously dispute the factual basis for the judgment. It asserts that the judge was clearly erroneous in finding that Morton reasonably believed that CNA had accepted coverage.

 We are dealing here with a basic contract issue of offer and acceptance.[3] The "test of a true interpretation of an offer or acceptance is not what the party making it thought it meant or intended to mean, but what a reasonable person in the position of the parties would have thought it meant." *Ray v. Eurice,* 201 Md. 115, 127, 93 A.2d 272 (1952) (quoting 1 S. Williston, *A Treatise on the Law of Contracts* § 94 (Jaeger 3d Ed.1957)). *See also Chertkof v. Harry C. Weiskittel Co.,* 251 Md. 544, 553, 248 A.2d 373 (1968), *cert. denied,* 394 U.S. 974, 89 S.Ct. 1467, 22 L.Ed.2d 754 (1969). Maryland, in short, applies the objective standard as to the formation of contracts, and this standard applies to insurance contracts. 2 G. Couch, *Couch on Insurance 2d* § 14.14 (M. Rhodes Rev.Vol.1984). *See also National Grange Mut. Ins. v. Pinkney,* 284 Md. 694, 705, 399 A.2d 877 (1979) ("an insurance policy is a contract and it is under terms of contract law of the state that it should be interpreted").

 National Fire points to various inconsistencies in Morton's testimony as tending to show that a reasonable person in her position could not reasonably have understood that, on March 27, Jackson was accepting the Dino's risk. But it was for the trial judge to weigh the evidence and determine the credibility of the witnesses. *See Carling Brewing Co. v. Belzner,* 15 Md.App. 406, 412, 291 A.2d 175 (1969). If there was evidence to support his finding, we cannot hold it to be clearly erroneous. Md. Rule 1086. The judge could have, and apparently did, accept Morton's ver-

---

**3.** An oral contract of insurance may be valid. *Flester v. Ohio Casualty Co.,* 269 Md. 544, 551, 307 A.2d 663 (1973). National Fire does not question this.

sion of the March 27 conversation, and not Jackson's. He was entitled to do so.

National Fire avers, however, that if Morton (or Tongue, Brooks) did not in fact believe that a contract had been formed, then the objective standard does not apply. *See Binder v. Benson*, 225 Md. 456, 461, 171 A.2d 248 (1961). While *Binder* does not stand for precisely this proposition, it seems fair to assume that if Morton made manifest her subjective understanding that no contract had been formed, Tongue, Brooks could not rely on the objective standard. Put otherwise, if Morton (Tongue, Brooks) was actually aware that no coverage existed on or about March 27, a reasonable person in her (its) position could not be said to have believed that a contract had been formed.

The chief basis for this argument is a letter of March 27, written by John Brooks to Leo Helms, in which Brooks, asking Helms to verify his financial statement, said "I am very hopeful that Dino's will meet the requirements because it could result in some premium savings to us" and "Hopefully we'll have this matter ironed out within the next several days." National Fire claims this manifests a clear understanding on behalf of Tongue, Brooks that there was no coverage on March 27.

The record does not disclose the time sequence between the writing of this letter and Morton's possible statement to Brooks that Dino's was covered. The letter was written for the principal purpose of having Helms verify his financial statement. It could have been written before Morton told Brooks about her conversation with Jackson. Indeed, Morton may not have reported this conversation to Brooks on March 27; both she and Brooks were unclear on whether she did so.

The issuance of the one-year binder by Morton might also be regarded as some evidence that she did not believe CNA had accepted coverage. Arguably, there would be no need for a binder if there was a firm agreement that a policy was to issue retroactive to February 5. But the record suggests

that a possible motivation for the binder was the desire of Dino's potential mortgagee to obtain evidence of insurance coverage. The binder could have been a way of providing that, pending delivery of the policy.

In any case, the letter and the binder were but items of evidence for the judge to weight against other evidence including the following:

After March 27 Tongue, Brooks ceased all efforts to cover Dino's through CNA or through a non-CNA insurer. This is in marked contrast to the diligent efforts expended by Morton prior to that date.

On March 27 Morton prepared a file memo indicating that CNA had accepted coverage.

Brooks, on April 3 or 4, wrote a memo indicating that CNA had accepted coverage.

On March 8 CNA delivered a worker's compensation policy on Dino's. It was CNA's practice not to issue such policies except in conjunction with other coverage.

■ In short, a fact-finder could have decided, on this record, that Morton (Tongue, Brooks) reasonably (objectively) and actually (subjectively) believed that coverage had been accepted. That CNA was of a like view might also be found from issuance of the workers' compensation policy. Acceptance of an offer to make a contract "can be accomplished by acts as well as words; no formal acceptance is required." *Porter v. General Boiler Casting Co.*, 284 Md. 402, 409, 396 A.2d 1090 (1979). A trier of fact "may elect to pick and choose which evidence to rely upon." *Attorney Grievance Commission v. Nothstein*, 300 Md. 667, 684, 480 A.2d 807 (1984).

■ National Fire's final attack on the insurance contract is based on the notion that it was indefinite because it made no mention of premiums and because no insurer was specifically identified. It is certainly true that "failure to agree on or even discussion of essential terms of a contract may indicate that the mutual assent required to make a contract

is lacking." *Klein v. Weiss,* 284 Md. 36, 63, 395 A.2d 126 (1978). Nor do we question that premium and identity of the insurer are normally essential terms of an insurance contract. *Annot.,* 14 A.L.R.2d 588 (1967). Nevertheless, it is not always necessary that the amount of a premium be agreed upon before a casualty insurance policy is effective. The law will imply a promise to pay the reasonable or customary premium. *Annot.,* 14 A.L.R.3d 589–90 (1967). *See also* 14 J. Appleman, *Insurance Law & Practice* § 7843 at 41–42 (1944) ("the law implies the usual and customary premium where the insurance contract is executed without any agreement as to the amount") and 2 G. Couch, *supra,* § 14:16, at 33 (". . . the law will imply a promise to pay the standard rate").

■ In this case, the premiums were in fact established by tables that were in the possession of both CNA and Tongue, Brooks. The parties, by use of these tables, in effect specified "a practicable method by which the amount" could be determined. *See Foard v. Snider,* 205 Md. 435, 445, 109 A.2d 101 (1954) (quoting A. Corbin, *Corbin on Contracts* § 98 at 433–34 (1963)). After the loss National Fire, it seems, had no difficulty in determining the premium nor was there any objection to its payment. We are not persuaded that the contract was invalid because no premium was discussed in the March 27 conversation.

■ As to the identity of the insurer, we think National Fire's argument is disingenuous. It is clear from the record that neither party was much concerned about the identity of the insurer. Morton was dealing with CNA, an umbrella over eight insurance companies. All she wanted was coverage from one of them. She designated Continental Casualty on several of the binders she wrote and since CNA had copies of the pre-March 27 binders, this could have been enough to persuade a fact-finder that on March 27 both Jackson and Morton reasonably assumed that Continental would be the insurer. The fact that CNA, which apparently had the ability to decide which of its companies

would accept the Dino's risk, later decided that National Fire would bear the loss has little bearing on whether a contract was formed on March 27. Nor does the fact that Dino's and Tongue, Brooks accepted CNA's substitution of National Fire for Continental. *See Dubuque Fire & Marine Insurance Co. v. Miller,* 219 S.C. 17, 64 S.E.2d 8 (1951).

JUDGMENT AFFIRMED. APPELLANT TO PAY THE COSTS.